# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

CHARLES M. O'NEAL,        )
                                    )
            Petitioner,    )
                                    )
     v.                  )         **Case no. 4:17cv00765 PLC**
                                    )
EILEEN RAMEY and ERIC SCHMITT,  )
                                    )
        Respondents.[1]   )

## MEMORANDUM AND ORDER

Petitioner Charles M. O'Neal seeks federal habeas corpus relief from a Missouri state court judgment entered after a bench trial. 28 U.S.C. § 2254. Respondents Eileen Ramey and Eric Schmitt filed a response to the petition, along with copies of the materials from the underlying state court proceedings. Petitioner replied and addressed only Grounds One and Five. With respect to Ground Five, Petitioner requests an evidentiary hearing. See Pet'r reply at 10 [ECF No. 19]. For the reasons set forth below, the Court denies the petition, as well as Petitioner's request for an evidentiary hearing.[2]

### I. Background

#### Prior proceedings

In April 2007, the State filed an "Information in Felony Case" charging Petitioner with being a prior offender under Missouri Revised Statutes § 558.016 and committing on February 10,

---

[1] The Court substitutes Eileen Ramey, the present Warden of the Jefferson City Correctional Center ("JCCC") where Petitioner is incarcerated, for Jay Cassady who was the Warden of the JCCC and named as the Respondent at the time Petitioner filed this habeas proceeding. Fed. R. Civ. P. 25(d). Additionally, the Court adds as a respondent Eric Schmitt, the Missouri Attorney General, because Petitioner is challenging a sentence to be served in the future. Rule 2b of the Rules Governing Section 2254 Cases in the United States District Courts.

[2] The parties consented to the exercise of authority by a United States Magistrate Judge pursuant to 28 U.S.C. Section 636(c).

2007, in Howard County, Missouri:   murder in the first degree in violation of Missouri Revised Statutes § 565.020 by knowingly causing Dawn Kelly's ("Victim's")[3] death by shooting her (Count I); assault in the first degree in violation of Missouri Revised Statutes § 565.050 by pointing "a loaded .22 cal[iber] rifle at Jared Forbes" in an attempt to kill Mr. Forbes and, while doing so, inflicting serious physical injury on Mr. Forbes (Count II); and armed criminal action in violation of Missouri Revised Statutes § 571.015 related to the first-degree murder offense charged in Count I (Count III).  By a "Case Litigation Agreement" signed by Petitioner, his attorneys, and the prosecutor on August 31, 2007, the State withdrew the death penalty, Petitioner waived his right to a jury trial, and both parties agreed "that venue may be changed to Randolph County, Missouri." Subsequent proceedings occurred in the Circuit Court of Randolph County, Missouri.

In September 2008, the State filed a "First Amended Information in Felony Case" ("first amended information") charging Petitioner (not as a prior offender) with committing on February 10, 2007, in Howard County, Missouri:   murder in the second degree in violation of Missouri Revised Statutes § 565.021 by shooting and killing Victim "as a result of the attempted perpetration of the class C felony of Felonious Restraint under" Missouri Revised Statutes § 565.120 (Count I); the Class A felony of first-degree assault in violation of Missouri Revised Statutes § 565.050 by pointing "a loaded .22 cal[iber] rifle" at Mr. Forbes in an attempt to kill him and resulting in the infliction of serious physical injury on him (Count II); and  armed criminal action in violation of Missouri Revised Statutes § 571.015 related to the second-degree murder offense charged in Count I (Count III).  Materials from Petitioner's guilty plea proceeding and his first post-conviction proceeding challenging that plea, which occurred between the filing of the first amended

---

[3] Dawn Kelly has two daughters, both of whom testified at trial and one of whom has Dawn Kelly's last name.  To limit confusion, the Court refers to Dawn Kelly as "Victim" for purposes of this Memorandum and Order. By this reference, the Court means no disrespect to any person, in particular Petitioner's second victim, Jared Forbes.

information in September 2008 and the filing of the motion to withdraw that information in August 2010, are not available in the record.  Based on Petitioner's statements in his petition, the State's statements in its response and the Missouri Court of Appeals' opinions in Petitioner's appeals, as well as a review of the docket sheets for Petitioner's criminal case resulting in the plea, Case No. 07H5-CR00058-02, and Petitioner's first post-conviction proceeding, Case No. 09RA-CV00820, it appears that:

(1) Petitioner pleaded guilty to the three offenses charged in the first amended information;

(2) on November 19, 2008, the plea court imposed consecutive terms of imprisonment of thirty years, fifteen years, and ten years for the three offenses;

(3) Petitioner challenged his plea through a pro se motion seeking post-conviction relief ("PCR") under Missouri Supreme Court Rule 24.035 that he filed in May 2009 and then through an amended PCR motion filed by Petitioner's first post-conviction motion attorney in August 2009;

(4) the post-conviction motion court held a hearing on the amended PCR motion in April 2010; and

(5) on July 30, 2010, the post-conviction motion court "found in favor of [Petitioner] and vacated [Petitioner]'s guilty plea[] in this case."

After Petitioner's successful challenge to his guilty plea, the State moved to withdraw the "first amended information," which the State argued had been "predicated upon [Petitioner]'s guilty plea and the plea agreement entered into by the State and [Petitioner]."   See also Trial Tr., Resp'ts Ex. A, at 94 (prosecutor advises trial court that trial is not proceeding on the first amended information, which was "filed in anticipation of a [guilty] plea").

The docket sheet for Petitioner's underlying criminal case, State v. O'Neal, Case No. 07H5-CR00058-03, states in relevant part that:  (1) the trial court granted Petitioner's plea attorneys leave to withdraw; (2) on December 7, 2010, two attorneys entered an appearance for Petitioner; (3) at a hearing on December 13, 2010, Petitioner advised that he "ha[d] no objections to [the] Motion to file the second amended charges providing [the] death penalty is still waived and [a] jury trial [is] waived," and the prosecuting attorney argued the "[s]ame"; (4) on January 26, 2011, the State filed the "Second Amended Information in Felony Case" ("second amended information"); and (5) the then-presiding trial judge "recuse[d himself] due to prior guilty plea/bench trial issue."  On February 4, 2011, the Missouri Supreme Court assigned a state court trial judge to preside over Petitioner's case.

Pretrial Proceedings

By the second amended information, the State charged Petitioner, as a prior offender under Missouri Revised Statutes § 558.016, with committing on or about February 10, 2007, in Howard County, Missouri:  murder in the first degree in violation of Missouri Revised Statutes § 565.020 (Count I); the Class A felony of assault in the first degree in violation of Missouri Revised Statutes § 565.050[4] (Count II), and armed criminal action in violation of Missouri Revised Statutes § 571.015 related to each of the offenses charged in Counts I and II (Counts III and IV).  With respect to the first-degree murder offense in Count I, the State alleged that Petitioner, "after deliberation,

---

[4] Missouri Revised Statutes Section 565.050 in effect at the time of the charged assault provided:

      1. A person commits the crime of assault in the first degree if he attempts to kill or knowingly causes or attempts to cause serious physical injury to another person.

      2. Assault in the first degree is a class B felony unless in the course thereof the actor inflicts serious physical injury on the victim in which case it is a class A felony.

Mo. Rev. Stat. § 565.050 (eff. 1984 through Dec. 31, 2016).

4

knowingly caused the death of [Victim] by shooting her."  With respect to the Class A felony of first-degree assault charged in Count II, the State alleged that Petitioner "pointed a loaded .22 cal[iber] rifle at Jared Forbes and then fought with him,"[5] which conduct constituted "a substantial step toward . . . attempting to kill" Mr. Forbes and "inflicted serious physical injury on" him.  With respect to the armed criminal action offenses in Counts III and IV, the State alleged that Petitioner committed the related felony (of either first-degree murder or first-degree assault) "by, with and through the use, assistance and aid of a deadly weapon."

The day of the shooting, which was also the day of Petitioner's arrest, Sergeant David Rice, an investigator with the Missouri Highway Patrol, interviewed Petitioner at the Howard County Sheriff's Department on three occasions.  Petitioner filed a motion to suppress statements elicited by Sergeant Rice, arguing that any statement he made after he "indicated he no longer wanted to speak" resulted in a violation of his rights under the Fifth and Fourteenth Amendments.   In particular, Petitioner focused on statements he made during the third interview where Sergeant Rice:  (1) reviewed Petitioner's Miranda rights;[6] (2) questioned Petitioner until he "indicated that he no longer wanted to talk"; (3) turned off the recorder "while questioning continued for fifteen minutes," and then (4) turned the recorder "back on . . . [with] questioning resum[ing]" without another review of Petitioner's Miranda rights.

In November 2011, the trial court conducted a hearing on Petitioner's motion to suppress. The State presented Sergeant Rice and introduced, without objection, the "Notification of Rights" form Petitioner initialed and signed at the start of each of the three interviews, as well as the cd recording and transcript for the three interviews.  Petitioner presented Jeff Glandon, who at the

---

[5]  The "and then fought with him" language was added as an amendment by interlineation during trial.  See Trial Tr., Resp'ts Ex. A, at 316-20 [ECF No. 10-1 at 79-80].

[6]  A reference to the interrogation-related rights set forth in Miranda v. Arizona, 384 U.S. 436 (1966).

time of the shooting was an officer with the City of New Franklin, Missouri, Police Department and who assisted the Howard County Sheriff's Department in responding to the shooting.

At the suppression hearing, Sergeant Rice testified that he, alone, interviewed Petitioner three times on February 10, 2007, with all interviews focused on the shooting incident at Victim's home.  Sergeant Rice conducted each interview in a private interview room at the Howard County Sheriff's Department and audiotaped each interview as it occurred (except for a period of approximately fifteen minutes during the third interview).  At the beginning of each interview, Sergeant Rice reviewed with Petitioner his Miranda rights and Petitioner initialed and signed a "Notification of Rights" form.  At some point during the course of the interviews Petitioner told Sergeant Rice that he had consumed approximately twenty beers and a pint of vodka at an undisclosed time earlier "that day."[7]

The first interview began at approximately 4:00 a.m. and lasted approximately seventy minutes.  Sergeant Rice testified that, during the first interview, they spent time discussing background information, such as information about Petitioner, his relationship to Victim, and his relationship to her family.  Petitioner told Sergeant Rice that Victim "was the mother of his on-again/off-again girlfriend," Amanda Kelly, and Petitioner went to Victim's home the night of February 9, 2007, to find Amanda.

Petitioner provided during the first interview two different versions of his reasons for going into Victim's home with a gun.  For the first version, Petitioner told Sergeant Rice he went to Victim's residence with a rifle for the purposes of selling the rifle to Mr. Forbes, who lived with Victim and was her fiancé.  Petitioner said Mr. Forbes grabbed him from behind, causing the rifle

---

[7] Trial testimony of Milo Carlson, who was with Petitioner for several hours before the shooting, reveals that, prior to the shooting, Petitioner and Mr. Carlson drank a large quantity of beer and some vodka between approximately 9:00 p.m. and 11:30 p.m. on February 9, 2007.

to go off.  Sergeant Rice stated that Petitioner reported he "fled the house" "after the rifle went off."  In his second version, Petitioner told Sergeant Rice he took the rifle into Victim's home "with the intention of killing himself," and the rifle went off and he shot Victim when Mr. Forbes "[w]ent to tackle him or grab him from behind."  Petitioner also told Sergeant Rice that he "wasn't sure where he shot [Victim], and that he fled the residence."  Sergeant Rice testified he ended the first interview to learn any information investigators had obtained from the crime scene and witnesses.

In the second interview, which started at approximately 8:00 a.m. and lasted about thirty-five to forty-five minutes, Sergeant Rice presented Petitioner with information he had learned from the crime scene investigators and witnesses that contradicted Petitioner's statements during the first interview.  Near the end of the second interview, Petitioner asked Sergeant Rice about Victim's condition.  Upon learning Victim had died, Petitioner became "visibly upset," stood up, walked to the door of the interview room, and said, "Man, I can't talk about it no more, dude."  The second interview ended at that point.

Sergeant Rice interviewed Petitioner for a third time beginning at 1:05 p.m.  After Sergeant Rice mentioned he had spoken to Kelly O'Neal (Petitioner's sister, who was in Victim's home around the time of the shooting) and Mr. Carlson (who had accompanied Petitioner to Victim's home and stayed in the car when Petitioner went in the home), Petitioner said, "I still don't feel like talking, but [I] feel terrible."  After that statement, Sergeant Rice continued the interview and, after about five minutes, Petitioner said he would tell Sergeant Rice what happened if he turned off the recording device.  Sergeant Rice turned off the recording equipment for approximately ten or fifteen minutes, during which time Petitioner told Sergeant Rice that he got the rifle from a friend with the intention of killing a man involved with Petitioner's ex-girlfriend, Victim's

daughter Amanda Kelly.  Petitioner brought the rifle into Victim's house and pointed it at Victim demanding to know where Amanda was.  When Victim would not tell him, he became "very emotional," "very upset with" Victim, and "the gun went off and he shot" Victim.  Sergeant Rice then turned on the recording device and questioned Petitioner with respect to what he had said during the time the recording equipment was turned off.  Sergeant Rice testified that Petitioner re-stated the information Petitioner had provided while the recording equipment was turned off.

Petitioner presented the testimony of then-Officer Glandon, who arrived at Victim's home shortly after the shooting and, learning that Petitioner was at his parents' home approximately two to three miles down the road, headed to the home with Howard County Sheriff Polson and Missouri State Highway Patrol Trooper Tony Piercy.  At the home, Officer Glandon, Sheriff Polson, and Trooper Piercy found Petitioner sitting in the living room.  Officer Glandon testified that Petitioner said "I f----- up," and he and Trooper Piercy handcuffed Petitioner and escorted him out of the home without incident.  Officer Glandon "believed it was highly probable that [Petitioner] was intoxicated" because Officer Glandon heard slurred speech, characterized Petitioner's demeanor as "lethargic," and provided Petitioner with assistance to stand and be handcuffed.  When Officer Glandon, Petitioner and Trooper Piercy arrived at the patrol car outside the home, Petitioner started talking with Trooper Piercy, who told Petitioner to stop talking and then recited Petitioner's Miranda rights.  Officer Glandon did not recall Petitioner asking for an attorney after hearing those rights.

Prior to trial, the trial court entered an order denying Petitioner's motion to suppress.

Trial proceedings

At the start of the December 2011 bench trial, the trial court announced that, with the parties' consent, the exhibits admitted and evidence presented during the hearing on Petitioner's

8

motion to suppress "would be considered as a part of the trial evidence as well."  In addition, the State introduced during trial various exhibits, including photographs of Victim, blood, the rifle, and cartridges found at the scene of the shooting; Victim's death certificate[8] and autopsy report; a photograph of Mr. Forbes' head; lab reports regarding the firearm (a Winchester .22 rifle) and toxicology testing; several .22 caliber rounds (one spent round and four live rounds) and bullet fragments; and letters Amanda Kelly wrote to Petitioner.  The exhibits Petitioner introduced during trial included Mr. Forbes' medical records.

The State presented at trial:

(1)     Amanda Kelly, Victim's daughter and Petitioner's ex-girlfriend, who was not present at the time of the shooting and assault;

(2)     Jared Forbes, Victim's fiancé, who was living with Victim and was in their home when Petitioner shot Victim in the living room area and then assaulted Mr. Forbes near his bedroom;

(3)     Brooke Arnold, Victim's daughter and Amanda Kelly's younger sister, who was living at Victim's home and was in the home when Petitioner shot Victim and assaulted Mr. Forbes;

(4)     Jeff Watts, a Deputy with the Howard County Sheriff's Department at the time of the shooting and the second officer at the scene;

(5)     Kurt Mueller, an investigator with the Missouri State Highway Patrol who responded to and processed the crime scene;

---

[8]  The death certificate available of record states that (1) Victim died immediately upon being shot in the head at approximately 12:50 a.m. on February 10, 2007, and (2) Victim was pronounced dead at 1:17 a.m. on the same date.  Legal File, Resp'ts Ex. B, at 16-17 [ECF No. 10-2].

(6)     Milo Carlson, who accompanied Petitioner for several hours during the evening preceding the shooting and then to Victim's home, stayed in the vehicle while Petitioner went inside Victim's home, and then accompanied Petitioner to Petitioner's parents' home; and

(7)     Tony Piercy, a trooper with the Missouri State Highway Patrol who responded to the crime scene.  Petitioner did not testify or present witnesses (other than Officer Glandon, who testified at the hearing on Petitioner's motion to suppress) during trial.

Amanda Kelly testified she was seventeen years old and living at another location but had been staying at her mother's (Victim's) home around the day of the shooting.  She identified others living at Victim's home at the time of the shooting as:  Petitioner, Victim, Mr. Forbes (Victim's fiancé), Brooke Arnold (Amanda Kelly's younger sister and Victim's daughter, who was fourteen years old at the time of the shooting), Kelly O'Neal (Petitioner's sister), and Kelly O'Neal's boyfriend who stayed there occasionally.  Amanda said she and her family had known Petitioner and his family most of their lives, and she and Petitioner began a romantic relationship when Amanda was sixteen years old and Petitioner was nineteen years old.  Amanda testified that she and Petitioner were in an "on again/off again boyfriend and girlfriend" relationship prior to the shooting incident.  Amanda Kelly has a daughter, who is not Petitioner's daughter, and her relationship with her daughter's father caused problems between her and Petitioner.  In the week before the shooting she decided she needed to leave her relationship with Petitioner and wrote Petitioner more than one letter stating she was not happy and did not want to continue their relationship.  On February 9, 2007, she left at least one letter with Petitioner's clothing at Victim's home for Petitioner to pick up.  That evening, she went out with friends and spoke with Victim by telephone after Petitioner picked up his clothing and letter.  Victim told Amanda Kelly the "pick

up" of the clothing and letter by Petitioner went "fine."  Amanda Kelly spent the night at a friend's home and was not at Victim's home when the shooting occurred.

Mr. Forbes testified that at the time of the shooting he was living at Victim's home with Victim, Victim's two daughters (Amanda Kelly and Brooke Arnold), Petitioner, Petitioner's sister (Kelly O'Neal), and her boyfriend.  Mr. Forbes remembered that, before he went to his bedroom early the evening of February 9, 2007, Petitioner had stopped by Victim's home twice.  Mr. Forbes was awakened at some point later and saw Petitioner "standing in the doorway of [Mr. Forbes'] bedroom [with] a [rifle] pointed at [Mr. Forbes] and yelling at [Mr. Forbes] to . . . 'Get the f--- up.' ['Get you're a-- out of bed']" repeatedly.   Mr. Forbes testified Petitioner was standing approximately three to four feet away from him.  Mr. Forbes got out of bed and tried to talk Petitioner into calming down but Petitioner continued to point the rifle at Mr. Forbes' head while walking backwards and telling Mr. Forbes to follow him into the other room.

"A couple of feet" outside the bedroom door, Petitioner yelled at Mr. Forbes "to get down on [his] knees," which Mr. Forbes did.  Petitioner moved closer to Mr. Forbes, so the barrel of the gun was "approximately one foot from [Mr. Forbes'] head," yelling for Mr. Forbes "to lay down on the ground."  At that moment, Mr. Forbes heard "Brooke yell, '[Petitioner], you shot my mom.'" Petitioner "turned and looked toward the direction [from] where she was yelling" and, "[w]hen [Petitioner] looked away," Mr. Forbes "reached out and grabbed the barrel of the gun" and pulled it "so [Mr. Forbes] wasn't in the line of fire of the weapon."  Petitioner knocked Mr. Forbes to the ground on his back and landed on top of Mr. Forbes, with the gun between them.  Petitioner used his fists to hit Mr. Forbes in the face when Petitioner could not get the gun away from Mr. Forbes, and Mr. Forbes yelled to Brooke to call 911 to get the police there.  While Brooke made the phone call, Petitioner and Mr. Forbes continued fighting.  At one point, Petitioner yelled that he was

11

going to "cut [Mr. Forbes'] f---ing heart out" and "reached . . . [a hand] . . . into [a] pocket."  Mr. Forbes responded by striking Petitioner in his groin.  Petitioner "jumped up off the top of [Mr. Forbes and] said something to the effect of 'Well, f--- it, I'll just go grab another gun and come back'[ a]nd ran out the door."

Once Petitioner was out of the house, Mr. Forbes wedged a chair against the door to the house and noticed Victim sitting on the couch with a pool of blood on her chest.  He went to the couch to attend to Victim, who did not respond.  When Mr. Forbes realized there was nothing he could do for Victim he picked up the gun he described as a "bolt action rifle," found a live round in it, and pointed it at the door, in case Petitioner returned before law enforcement officers arrived.

Mr. Forbes had a bleeding gash above his left eyebrow, requiring approximately five stitches, facial swelling impacting his vision, sore ribs, and no broken bones as a result of the incident with Petitioner.  Mr. Forbes was discharged from the emergency room and returned to work in approximately three weeks, with only a barely visible facial scar remaining.

Brooke Arnold testified that she was fourteen years old at the time of the shooting and was at Victim's home (but in a different room) when the shooting occurred.  Brooke recalled that Petitioner stopped by the home twice before the shooting.  She stated the first time Petitioner stopped by on February 9, 2007, he "pick[ed] up some things that belonged to him after h[e] and [her] sister . . . split up that day."  The box Petitioner picked up contained clothing and a letter her sister, Amanda Kelly, had written him.  The second time Petitioner stopped by, Brooke said, he arrived in a truck with Milo Carlson and asked Brooke to get Petitioner's sister, who went outside while Brooke stayed inside.

The third time Petitioner arrived at the house, Brooke testified it was "very late, probably around midnight or so."  Brooke was in her bedroom relaxing after having said good night to

12

Victim.  At some point, she heard Petitioner's sister (Kelly O'Neal) "say something to the effect of "[Petitioner], don't shoot me.  Don't shoot me.  And then [she] heard a gunshot go off shortly after."  Brooke "got up out of [her] bed[,] . . . walked to [her] doorway[,] . . . opened the door . . . and saw [Petitioner's sister] running past [her] and going into [a] bedroom to go out the bedroom window."  After seeing Petitioner's sister run out, Brooke "went into the living room . . . to see what was going on . . . and . . . found [her] mom sitting" on the couch.  Brooke testified Victim "looked like she was asleep . . ., so [Brooke] tried to wake her up."  After touching Victim's head, Brooke noticed blood on her hands.  Brooke looked around and saw Petitioner "standing in the doorway" of Victim's and Mr. Forbes' bedroom.  She heard Petitioner, who sounded "highly angry," say to Mr. Forbes, "Get up . . . I [am] going to kill you like I did your wife."   Brooke called out, "'[Petitioner], you shot mom.' And [when Petitioner] turned around," Mr. Forbes "grabbed . . . the gun and it started a scuffle between the two of them."  Brooke "called the cops. . . . After [she] called the cops [Petitioner] stopped beating [Mr. Forbes] and took off out of the door and [she heard Petitioner say that] he was going to grab another gun and come back and finish the job."

Deputy Watts, who was the second officer arriving at the scene, saw Mr. Forbes, who was "real bloody" and "holding a long-barrel weapon," inside Victim's home.  Mr. Forbes gave the gun to Deputy Watts, who placed it in the trunk of his patrol car for safekeeping until he turned it over to the Missouri State Highway Patrol.  Deputy Watts also went to Petitioner's parents' home and drove Petitioner, after he was handcuffed, from that home to the Howard County Sheriff's Department, where Deputy Watts stayed with Petitioner until his first interview with Sergeant Rice.  Before Petitioner was placed in his patrol car, Deputy Watts heard Trooper Piercy advise

Petitioner of his <u>Miranda</u> rights and ask Petitioner if he understood those rights, to which Petitioner responded, "Okay."

Sergeant Kurt Mueller, a criminal investigator with the Missouri State Highway Patrol, processed the crime scene after the shooting, taking photographs and seizing evidence.   He observed blood in the entrance area at the front door, on the living room carpet, where Victim was on the couch, and in the area where Mr. Forbes had been assaulted.   Sergeant Mueller further testified he found an empty or spent shell casing on the floor by the couch near Victim and three live rounds on the floor near where Mr. Forbes was assaulted.

Milo Carlson, who was seventeen years old at the time of the shooting, saw Petitioner at about 8:00 p.m. or 9:00 p.m. on February 9, 2007, when Petitioner arrived at a mutual friend's house, told them he and Amanda Kelly had broken up, and asked if they would go drink and hang out with him.   Mr. Carlson and Petitioner rode around in a truck while drinking beer and vodka. Petitioner showed Mr. Carlson the letter Amanda had written Petitioner and "didn't seem too distraught about it at that time."   They stopped at Victim's home twice.   The first time so Petitioner could "talk to his sister," Kelly O'Neal, who went out to the truck to talk for about twenty minutes. Petitioner told her he and Amanda had broken up.   They then went to Mr. Carlson's home to get something to eat and Petitioner asked Mr. Carlson if he "wanted to go shoot some beer cans out on a gravel road."

Mr. Carlson agreed, and got a gun from the house, "an old single-shot .22 bolt action" gun, and some ammunition.   Mr. Carlson did not shoot that night and recalled that Petitioner fired the gun once before, "seem[ing] real distraught[, he] got to talking about Amanda[,] . . . was upset about how things went . . . [and] felt mistreated by Amanda and her mother."   Soon, Petitioner "jumped in the truck and . . . said, 'Oh, we have to go now.'"   Mr. Carlson got in the truck and

testified that Petitioner seemed "really upset[,] . . . mad[,] . . . distraught . . . [and said, . . . I'm] going to go kill Dawn."

At Victim's home, Petitioner "hopped out of the truck," took the gun with him and entered the home. Mr. Carlson remained inside the truck, heard an argument and then a gunshot, before Petitioner got back in the truck several minutes after the gunshot. While driving away, Petitioner told Mr. Carlson that "he had [Victim] at gunpoint and then [Mr. Forbes] tackled him and that's when the gun went off." Mr. Carlson said Petitioner "had blood on his knuckles" and told Mr. Carlson that he and Mr. Forbes "got into a fight."

Petitioner drove them to his parents' home and they went inside. Petitioner told his parents "that [Mr. Forbes] grabbed him and the gun went off." Petitioner said, "I can't believe what I just did." Mr. Carlson testified that, while he thought they both stopped drinking after target shooting, at approximately 11:00 p.m., he was so drunk that he "passed out" on a bed at the O'Neals' home.

Trooper Piercy participated in Petitioner's arrest at his parents' home at approximately 2:00 a.m. on February 10, 2007. When Trooper Piercy and other officers arrived at the home, Petitioner's father, Mike O'Neal, invited them inside the home, where they found Petitioner sitting in the living room. They advised Petitioner he was under arrest and Sheriff Polson handcuffed Petitioner. Trooper Piercy described Petitioner as "extremely intoxicated." Trooper Piercy and Officer Glandon escorted Petitioner out of the residence. Before they arrived at the patrol car, Petitioner began to speak and Trooper Piercy "interrupted him and advised him of the Miranda rights, asking Petitioner if he understood them, to which Petitioner responded, 'Yes.'" After [Petitioner] was in the patrol car, Trooper Piercy asked him, "Now, what were you saying? And [Petitioner] continued on with another statement, . . . [saying] 'He was tired of being f---ed with and this time he f---ed back.'"

15

At the conclusion of Trooper Piercy's testimony, the State requested and obtained leave of Court to amend Count II by interlineation to mention the fight between Petitioner and Mr. Forbes. Then the State rested, and the trial court overruled Petitioner's motion for judgment of acquittal at the close of the State's evidence.

The defense asked the trial court to consider Officer Glandon's testimony at the hearing on the motion to suppress as testimony presented at trial, which the trial court confirmed it would do. The trial court then examined Petitioner under oath regarding his right to testify. Petitioner stated he was twenty-six years old, not under the influence of any alcohol or drugs, and not suffering from any mental condition impairing his ability to understand the proceeding. Petitioner further testified that no one had promised him anything or threatened him with anything to get him not to testify; that he understood his constitutional right to testify at the trial and to remain silent and had discussed it with his counsel; he understood it was his decision to make; and understood that the State could cross-examine him about relevant facts related to the case if he took the stand. The trial court concluded Petitioner's decision "not to testify at th[e] trial [was] made knowingly, intelligently, and with a full understanding of the consequences of that decision on his rights and on his trial." The defense rested and the trial court overruled Petitioner's motion for judgment of acquittal at the close of all the evidence.

After hearing counsel's closing arguments and reviewing the evidence, the trial court announced from the bench that it found Petitioner guilty of first-degree murder (Count I) and armed criminal action (Counts III and IV) as charged. With respect to the first-degree assault charged in Count II as a Class A felony, the trial court found Petitioner not guilty of that offense but guilty of the lesser included offense of first-degree assault classified as a "B" felony as described in the same statute.

The trial court subsequently sentenced Petitioner to terms of imprisonment of life without the possibility of probation or parole for first-degree murder, fifteen years for the Class B felony of first-degree assault running consecutively to the life sentence imposed for the first-degree murder, and twenty years for each of the two armed criminal action offenses with those sentences running concurrently with each other and with the sentences imposed for the first-degree murder and first-degree assault offenses.

Direct appeal

Petitioner raised one point in his direct appeal: that the trial court violated his right to remain silent in violation of the Fifth and Fourteenth Amendments by overruling his motion to suppress and admitting at trial statements he made after asserting his right to remain silent.  In support of his point, Petitioner focused on the following statements he made to the interrogating officer:  (1) "Man, I can't talk about it no more, dude," which Petitioner stated at the end of his second interview, and (2) "I still don't feel like talking," which Petitioner stated "at the beginning of his third interview."

The Missouri Court of Appeals for the Western District affirmed the trial court's judgment. See State v. O'Neal, No. WD74687 (Mo. Ct. App. filed Mar. 12, 2013), Resp'ts Ex. E.  Petitioner first argued "that the police violated his constitutional rights by even commencing the third interrogation, because he had unequivocally invoked his right to remain silent at the end of the second interview."  Id. at 11.  The Missouri Court of Appeals declined to decide whether Petitioner's statement at the end of the second interview invoked his right to remain silent, holding that "[e]ven if it did, the initiation of the third interview, almost five hours later, did not violate [Petitioner]'s rights."  Id. at 12.  After noting the "protection against compelled self-incrimination afforded by the state constitution is co-extensive with the right recognized in the federal

17

constitution" and stating its discussion "applie[d] equally to [Petitioner]'s claims under both federal and state law," the Missouri Court of Appeals analyzed Petitioner's argument under State v. Bucklew, 973 S.W.2d 83 (Mo. 1998) (en banc).  The Missouri Court of Appeals noted that the Missouri Supreme Court in Bucklew had found the United States Supreme Court's decision in Michigan v. Mosley, 423 U.S. 96, 104 (1975), required that, once a suspect invokes "Fifth Amendment privileges interrogation must cease and the right to remain silent must be scrupulously honored," which a court resolves by weighing five factors.[9]  O'Neal, No. WD74687, at 12-13 (quoting Bucklew, 973 S.W.2d at 89).

Upon consideration of the five factors, the Court of Appeals concluded Petitioner's right to remain silent was scrupulously honored, id. at 13, because:  (1) the second interrogation ended immediately after Petitioner told Sergeant Rice "he could not talk further," id.; (2) the third interrogation did not begin until "almost five hours after the second interview ended" and began with "Sergeant Rice advis[ing Petitioner] of his Miranda rights, again . . . and . . [with Petitioner] executing a Notification of Rights form," id. at 13, 14; (3) "there [wa]s no indication that [Sergeant] Rice initiated the [third] interview 'to wear down the resistance of [Petitioner] and make him change his mind,'" but, rather, it was Sergeant Rice's "attempt to resolve discrepancies between [Petitioner]'s version of the events leading up to [Victim]'s death and the accounts

---

[9]  The Missouri Court of Appeals quoted Bucklew as enunciating the following five factors for courts to weigh:

> (1) whether the police immediately ceased the interrogation upon defendant's request; (2) whether [the police] resumed questioning only after the passage of a significant period of time and provided fresh Miranda warnings; (3) whether the object of [the] subsequent interrogation was to wear down the resistance of the suspect and make him change his mind; (4) how many subsequent interrogations were undertaken; and (5) whether subsequent questioning involved the same crime.

State v. O'Neal, No. WD74687 at 12 (Mo. Ct. App. filed Mar. 12, 2013), Resp'ts Ex. E [ECF No. 10-5] (quoting State v. Bucklew, 973 S.W.2d 83, 89 (Mo. 1998) (en banc) (citing Michigan v. Mosley, 423 U.S. 96, 104 (1975)).

conveyed to Sergeant Rice by [Mr.] Carlson and Kelly O'Neal," Petitioner's sister, "between the second and third interviews,"[10] id. at 14; and (4) after the second interview, Sergeant Rice conducted only one interview, which "lasted well under an hour," id.  The Court of Appeals further concluded that "[t]he fifth factor (whether subsequent questioning involved the same crime) may generally favor [Petitioner]" but in itself does not "compel the conclusion that [Petitioner's] Fifth Amendment rights were not honored."  Id. at 15 (internal quotation marks and citation omitted) and 15 n. 11 (citing, in relevant part, United States v. McClinton, 982 F.2d 278, 281-82 (8th Cir. 1992), as supporting the principle that subsequent questioning regarding the crime that was the subject of earlier interrogations "is not disqualifying").  Here, such a conclusion was not warranted, the Missouri Court of Appeals explained, because the initiation of the third interview "did not violate [Petitioner]'s rights" in that he "was given a fresh Miranda warning before the third interview commenced, and in all other respects his invocation of his right to remain silent at the end of the second interrogation was scrupulously honored."  O'Neal, WD74687, at 15.

For his second argument, Petitioner urged the statement "I still don't feel like talking" he made "at the commencement of the third interview" was an "unequivocal[] invo[cation] of his right to remain silent."[11]  The Court of Appeals held that a court may not "search[] for out-of-context sentences that support a preferred outcome."  O'Neal, No. WD74687, at 18 (quoting State v. Clemons, 946 S.W.2d 206, 219 (Mo. 1997) (en banc)).  Rather, the Court of Appeals reasoned, "courts must look to the full context of a particular statement in order to determine whether a suspect invoked his rights or not."  Id.  The Court of Appeals concluded that statements Petitioner

---

[10]  The Court of Appeals also noted the almost-five-hour-long period between the second and third interviews "permitted [Petitioner] to become more lucid and alert" because he "showed signs of intoxication during the first and second interviews."  State v. O'Neal, No. WD74687 at 14 (Mo. Ct. App. filed Mar. 12, 2013), Resp'ts Ex. E.

[11]  O'Neal, No. WD74687, Resp'ts Ex. E, at 20.

made before and after "his purported invocation" undercut any invocation of his Fifth Amendment privilege against self-incrimination. The Court of Appeals specifically noted that "immediately before" Petitioner said, "I still don't feel like talking," Petitioner "had indicated that he was willing to participate in a conversation 'to clear up' inconsistencies between his own account of events, and the statements made by [Mr.] Carlson and Kelly O'Neal." Id. After his alleged invocation of his Fifth Amendment privilege against self-incrimination, Petitioner continued the statement by saying, "but, [I] feel terrible."[12] The Court of Appeals held that Petitioner's

> use of the conjunction "but" is an equivocation, which suggests that he was experiencing an internal conflict: while he did not want to talk about what had happened, other factors compelled him to do so. Moreover, . . . [after Sergeant Rice responded] by politely stating 'I'm sure you do,' [Petitioner] continued to speak, explaining his emotions. Then, after only a single, broad question concerning [Victim]'s murder, [Petitioner] expressed his desire to tell his version of events, so long as the tape recorder was turned off[, which] was *not* an invocation of his right to remain silent, but instead permitted Sergeant Rice to continue his questioning.

Id. at 18-19 (footnote omitted) (emphases in original). The Missouri Court of Appeals concluded that Petitioner's "statements exhibit – at most – some ambiguity or equivocation as to whether he wished to invoke his right to remain silent. In these circumstances, Sergeant Rice was under no obligation to cease questioning, or to seek clarification from [Petitioner] as to how he wished to proceed." Id. at 19.

Finally, the Court of Appeals held that "[e]ven if the trial court had erred, [Petitioner] would still not be entitled to reversal" because "the unchallenged evidence in th[e] case overwhelmingly establishe[d]" Petitioner's guilt, rendering "the admission of his statements during the third interrogation . . . harmless beyond a reasonable doubt." Id. at 20-21; see also id. at 22. In particular, the Court of Appeals explained:

---

[12] O'Neal, No. WD74687, Resp't's Ex. E, at 18.

20

[Petitioner] has admitted from the outset that he was the one who shot [Victim] on February 10, 2007.  The only remaining question was whether the shooting was accidental or intentional.  Even without considering [Petitioner]'s statements during the third interrogation, the evidence was overwhelming that this was not an accidental shooting.  At the time of his arrest, [Petitioner] said that "[h]e was tired of being fucked with and this time he fucked back."  This strongly suggests that he shot [Victim] intentionally, because she had barred him from her home, and had refused to contact Amanda [Kelly] for him, or tell [Petitioner] where [Amanda Kelly] was.  Milo Carlson testified that [Petitioner] was distraught because Amanda [Kelly] had ended their relationship.  Carlson testified that [Petitioner] expressed a specific intent to murder [Victim] as he drove to her house, armed with a weapon he had borrowed from Carlson (which [Petitioner] had taken the time to test-fire).  Brooke [Arnold]'s testimony that Kelly O'Neal begged [Petitioner] not to shoot her, before the fatal shot was fired, indicates that [Petitioner] had the gun pointed at Kelly O'Neal and [Victim] before the shooting.  [Petitioner]'s statement to [Victim]'s fiancé immediately after killing [Victim] (that he was going to 'kill [Mr. Forbes] like I did your wife'), as well as his later statement that he was going to retrieve another gun and return, further demonstrate his intent to kill.

[The Court of Appeals] also note[d] that the spent shell from the rifle had been manually ejected, and was found near [Victim]'s body.  The action of ejecting the round, and preparing the rifle to be fired again, is consistent with Forbes' and Brooke's accounts of what happened, and is inconsistent with [Petitioner]'s claim of a single, accidental discharge.

[Petitioner]'s prior [unchallenged] statements, during the first and second interrogations, provided further inculpatory evidence.  For example, during the first interview, [Petitioner] initially claimed he had taken the rifle to [Victim]'s home to show it to Forbes, because he believed Forbes might be interested in purchasing the gun from Milo Carlson.  But [Petitioner] admitted later in the first interrogation that this was a lie.  He then claimed that he had returned to [Victim]'s house intending to kill himself (possibly after killing [the father of Amanda Kelly's daughter]), but that he had no intent to harm [Victim].  That explanation is contrary, however, to Milo Carlson's testimony that [Petitioner] expressed a desire to kill [Victim].  Moreover, [Petitioner]'s story that he only fired the gun after Forbes tackled him is contrary to Forbes' own testimony, and the testimony of Brooke [Arnold]; both witnesses testified that [Petitioner] woke Forbes from his bed, forced him to kneel, and pointed the rifle at him, only after shooting [Victim].  In addition, in his second interrogation [Petitioner] denied that Milo Carlson was with him at the time of the fatal attack, a claim which is contradicted by Carlson's testimony.  The trial court obviously concluded that [Petitioner]'s pre-trial statements were false; these false exculpatory statements provide further evidence of his guilt.

It is also significant that, after shooting [Victim], [Petitioner] left [Victim's] home and fled, rather than attempting to aid her or awaiting the arrival of police.

The trier of fact could conclude that these actions provide further evidence of [Petitioner]'s guilt, and are inconsistent with his claim of an accidental shooting.

Id. at 21-22 (emphasis in original) (internal citations omitted).  The Court of Appeals issued its mandate on April 3, 2013.[13]

### Second post-conviction motion proceeding

After the direct appeal concluded, Petitioner filed a pro se PCR motion under Missouri Supreme Court Rule 29.15 setting forth four claims that his trial counsel and appellate counsel provided ineffective assistance through specified conduct.  In one of his claims,  Petitioner asserted his trial counsel provided ineffective assistance by failing to interview and call as a witness at trial Tarrell Huskey, who would have "impeached [Mr.] Forbes['] claim that he and [Petitioner] were not wrestling over the gun when it discharged."  Shortly after Petitioner filed his pro se PCR motion, the trial judge, who was assigned the PCR motion, recused himself and the Missouri Supreme Court assigned another state court trial judge to preside over Petitioner's second PCR motion proceeding.

Through appointed counsel, Petitioner filed an amended PCR motion setting forth ineffective-assistance-of-counsel claims and a request for an evidentiary hearing.  In relevant part, Petitioner asserted, in a claim Petitioner designated as "Claim 8A," that his trial counsel provided ineffective assistance of counsel by:  (1) failing to investigate and call as witnesses Mr. Huskey and four other named individuals to impeach Mr. Forbes' testimony, and (2) failing to investigate and call as witnesses Donna Williams (Petitioner's aunt) and Mike O'Neal (Petitioner's father), as well as four other named individuals, to impeach Mr. Carlson's testimony.[14]  For the claim he

---

[13] See April 3, 2013 entry on docket sheet for State v. O'Neal, No. WD74687 (Mo. Ct. App. filed Dec. 21, 2011) (available at https://www.courts.mo.gov/casenet/cases/searchDockets.do (last visited Dec. 16, 2020)).

[14] Petitioner also argued in his amended PCR motion that his trial attorney provided ineffective assistance of counsel "when admitting that [Petitioner] shot . . . [V]ictim during opening statement."

designated as "Claim 8B," Petitioner asserted his attorney during his first PCR motion proceeding (who successfully challenged Petitioner's guilty plea) provided ineffective assistance of counsel by failing to "fully and completely explain[]" to Petitioner "the risk and ramifications of challenging his initial judgment of conviction."

The second PCR motion court conducted an evidentiary hearing. At the start of the hearing, the motion court took judicial notice of the underlying criminal case file and Petitioner (1) withdrew the claim he had designated as "8B" (Petitioner's claim that his first PCR motion attorney provided ineffective assistance of counsel); (2) introduced, without objection, the transcript of Petitioner's deposition; and (3) introduced, subject to the hearsay objection presented during the deposition, the deposition of Mr. Huskey. During the hearing, Petitioner presented the testimony of Kayla (O'Neal) Page, Petitioner's ex-wife; Ms. Williams,[15] Petitioner's aunt; Mike O'Neal, Petitioner's father; and Carrie Allen, one of Petitioner's trial attorneys. The State presented Mr. Forbes as a witness at the second PCR motion hearing.

In its findings of fact and conclusions of law, the second PCR motion court first set forth its credibility findings. The motion court found the testimony of Mr. Forbes and Ms. Allen credible, and the testimony of Mr. Huskey, Petitioner, Mike O'Neal, and Ms. Williams not credible. With respect to Mr. Forbes, the motion court concluded he was credible "especially given the consistency between" his testimony at the evidentiary hearing and his testimony at trial. For Mr. Huskey, the motion court concluded it was free to consider Mr. Huskey's "litany of past criminal convictions," including one "for making a false report" when determining credibility. Because Mike O'Neal and Ms. Williams were Petitioner's "family members," the motion court

---

[15] At the hearing, Donna Williams testified that her last name was then "O'Neal" and "[n]ot Williams." Second PCR mot. hr'g tr. at 17, Resp'ts Ex. J [ECF No. 10-10]. Without intending any disrespect to her, the Court continues to refer to this individual as "Donna Williams."

characterized them as "hav[ing] an obvious bias" that may be considered, citing Armstrong v. Kemna, 590 F.3d 592, 602-03 (8th Cir. 2010), as having a "persuasive rationale" applicable in this case.  The motion court specifically mentioned that the testimony of Ms. Page "about [Petitioner]'s family's bias towards" Petitioner supported the conclusion that Mike O'Neal and Ms. Williams were biased in favor of Petitioner.

> With respect to Ms. Allen, the second PCR motion court specifically found that
>
> although [she] had some difficulty remembering many of the specifics of the case, she developed a trial strategy of attempting to persuade the fact finder that [Petitioner] was not guilty of first-degree murder, but rather of second-degree murder.  [She] further testified that she reached this trial strategy after considering other alternatives in a rational manner.  Finally, [she] testified that, in her experience, there were drawbacks to calling witnesses that had convictions because fact-finders weigh convictions against their credibility.  [She] also testified that she was even more reluctant to call family members as witnesses because fact-finders ascribe family bias to those witnesses.

On the merits of Petitioner's claim that his trial counsel provided ineffective assistance by not investigating and calling witnesses to impeach Mr. Forbes' testimony, the motion court characterized this claim as "essentially that [Mr.] Forbes made prior inconsistent statements about the shooting of [Victim] to Tarrell Huskey."  Concluding the hearing testimony of Petitioner and Mr. Huskey, which addressed this claim, was not credible, the motion court found Petitioner did not meet "his burden to prove by the preponderance of the evidence that trial counsel's actions were deficient performance."

The second PCR motion court also found Petitioner did not satisfy his burden to prove trial counsel's performance was deficient to the extent counsel failed to present the testimony of Mike O'Neal and Ms. Williams at trial to contradict Mr. Carlson's testimony.  Specifically, the motion court found the hearing testimony of Mike O'Neal and Ms. Williams "was not entirely consistent about either the location of Milo Carlson on the morning after the shooting or about the time when

24

Milo Carlson was told [Victim] had died."  The second PCR motion court concluded the inconsistency "further weaken[s] the testimony" of these two witnesses "beyond the[ir earlier mentioned family] bias."  That motion court also noted that Ms. Allen testified she "personally interviewed Milo Carlson as part of her trial preparation."

Finally, the second PCR motion court concluded "there [wa]s overwhelming evidence of Petitioner's guilt" and even if Mr. Huskey, Mike O'Neal, and Ms. Williams had been presented as witnesses during trial, "there [wa]s not a reasonable probability that the fact-finder would have reached a different result given the credibility of the witnesses" as found by that motion court. The second PCR motion court, therefore, denied Petitioner's claims that his trial counsel provided ineffective assistance.

<u>Post-conviction appeal</u>

Petitioner presented three points in his post-conviction appeal, challenging as violations of his Sixth and Fourteenth Amendment rights to the effective assistance of counsel his trial counsel's failure to present at trial the testimony of Mike O'Neal (point one), failure to investigate and call as a witness at trial  Mr. Huskey (point two), and failure to investigate and call as a witness at trial Ms. Williams (point three).[16]  In relevant part, Petitioner argued that Mike O'Neal's testimony would have contradicted Mr. Forbes' and Mr. Carson's trial testimony; Mr. Huskey's testimony would have contradicted Mr. Forbes' trial testimony; and Ms. Williams' testimony would have contradicted Mr. Carlson's trial testimony.

The Missouri Court of Appeals for the Western District affirmed the motion court's judgment in an unpublished <u>per curiam</u> order accompanied by a memorandum sent to the parties setting forth the reasons for the order.  <u>O'Neal v. State</u>, No. WD78273 (Mo. Ct. App. filed May

---

[16] Pet'r Br., Resp't Ex. G at 14-19.

10, 2016), Resp't Ex. I.  In its memorandum, the Missouri Court of Appeals described the factual

background of the case as follows:

In February 2007, [Petitioner] was involved in an on-again, off-again relationship with Amanda Kelly.  Amanda[2] was 17 years old and was staying in [a] house in Howard County with her mother (Dawn Kelly ["Victim"]); [Victim]'s fiancé (Jared Forbes); her sister (Brooke [Arnold]); [Petitioner]'s sister (Kelly O'Neal); and Kelly O'Neal's boyfriend . . . .

Amanda had a child with [a man other than Petitioner].  Amanda's ongoing contact with [that man] was a source of contention between Amanda and [Petitioner].  At one point, Amanda had broken up with [Petitioner] and resumed her relationship with [her daughter's father] before reconciling with [Petitioner].  In February 2007, the relationship between [Petitioner] and Amanda had deteriorated to the point that Amanda decided to end it.  [Petitioner] had been told he was no longer welcome to stay at [Victim]'s residence, and Amanda had written him several letters explaining why she no longer wished to see him.  She placed the letters with clothing [Petitioner] had left at [Victim]'s house. Amanda expected that, when [Petitioner] returned to retrieve his clothing, he would find the letters.

On the evening of February 9, 2007, Amanda went out with friends. [Petitioner] appeared at [Victim]'s house to speak with his sister and to retrieve his clothing.  After picking up his clothes and Amanda's letters, [Petitioner] went to a friend's house and met Milo Carlson.  [Petitioner] informed Carlson that Amanda had broken up with him; the two then left the friend's house, and "just went driving

---

[2] Both [Petitioner]'s and [Victim]'s family members were involved in the underlying events.  Because these individuals share the same surname with [Petitioner] or [Victim], first names are used to identify certain individuals for the sake of clarity.  No familiarity or disrespect is intended.

around on gravel roads drinking beer and stuff." At some point, [Petitioner] suggested that they "go shoot some beer cans out on a gravel road."  Carlson retrieved his father's .22-caliber bolt-action rifle and ammunition.  The pair proceeded to a gravel road to shoot the rifle.  [Petitioner] fired the gun once or twice, but then he became distraught and began talking about Amanda.  [Petitioner] complained that he had been mistreated by both Amanda and her mother [Victim]. [Petitioner] ended the target shooting abruptly, stating "[w]e have to go now." [Petitioner] got into his truck, and Carlson followed.  When both men were in the truck, [Petitioner] said, "I want to go kill [Victim]." [Petitioner] drove to [Victim]'s house.

[Petitioner] and Carlson arrived at [Victim]'s residence in the early morning hours of February 10, 2007.  [Petitioner] exited but told Carlson to wait in the truck. Four people were at the house:  [Victim], Forbes, Brooke, and Kelly [O'Neal].

26

Forbes was sleeping in the bedroom he shared with [Victim]; [Victim] and Kelly [O'Neal] were in the living room.  Brooke was in her bedroom listening to music on headphones.  [Petitioner] entered the home.  From her bedroom, Brooke heard Kelly [O'Neal] exclaim, "Bubba, don't shoot me.  Don't shoot me." ("Bubba" was [Petitioner]'s nickname.)  Brooke then heard a gunshot and went to her bedroom door.  Kelly [O'Neal] ran past her in the hallway and jumped out her bedroom window.  Brooke went to the living room and saw her mother, [Victim], sitting on the couch.  [Victim] appeared to be sleeping.  Brooke attempted to wake her.  After slapping [Victim]'s cheeks and calling her name, Brooke realized that she had blood on her hands and that [Victim] had been shot.

While Brooke was in the living room with [Victim], [Petitioner] proceeded to [Victim]'s bedroom and woke Forbes.  [Petitioner] pointed the rifle at Forbes and told him, "I'm going to kill you like I did your wife."  [Petitioner] ordered Forbes out of the bedroom and instructed him to get on his knees.  Forbes complied.  [Petitioner] pointed the rifle at Forbes's head.

Brooke saw [Petitioner] in the doorway of her mother's bedroom with a rifle and exclaimed, "Bubba, you shot my mom."  When [Petitioner] turned toward Brooke, Forbes grabbed the barrel of the gun and pulled it so that the rifle was no longer pointed at him.  [Petitioner] and Forbes began to struggle.  During the struggle, Forbes received a gash over his left eye that required five stitches.  Forbes yelled for Brooke to call 911.  Forbes struck [Petitioner] in the groin, and [Petitioner] let go of the gun and stood up.  [Petitioner] then left the house, threatening to return with another gun.  Forbes barricaded the front door and then checked on [Victim].  She had been shot in the eye and was dead.  Forbes picked up the rifle and stood against the door in case [Petitioner] returned with another weapon.

[Petitioner] returned to his truck.  He told Carlson that Forbes had tackled him while he had the rifle pointed at [Victim] and that the gun had gone off accidentally.  The two proceeded to [Petitioner]'s parents' house, where [Petitioner] repeated his account of an accidental shooting.  [Petitioner] remained there until the police arrested him at approximately 2:00 a.m. on the morning of February 10.

After being given the <u>Miranda</u> warnings, [Petitioner] told the arresting officer that "[h]e was tired of being fucked with and this time he fucked back." [Petitioner] was taken to the Howard County Jail.

<u>O'Neal</u>, WD78273, mem. at 2-3 (one footnote omitted).[17]

---

[17]  The Missouri Court of Appeals' statements of the facts relevant to this case as set forth in its decisions in Petitioner's direct appeal and Petitioner's PCR appeal are nearly identical.

Before beginning its analysis of Petitioner's points, the Missouri Court of Appeals noted it did not consider Petitioner's ineffective-assistance-of-trial-counsel argument that Mike O'Neal's testimony would contradict Mr. Forbes' testimony "because [that claim] was not raised in [Petitioner]'s amended [PCR] motion and was not presented to the [PCR] motion court for review." Id. at 7 n. 4.  The Court of Appeals then concluded Petitioner's counsel was not ineffective under the two-pronged test enunciated in Strickland v. Washington, 466 U.S. 668, 687 (1984).  For the first prong, the performance prong, the Court of Appeals stated Petitioner (1) must show that his trial counsel's performance was deficient, i.e., that counsel "failed to exercise the customary skill and diligence of a reasonably competent attorney under the same or similar circumstances," and (2) "must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy."  O'Neal, WD78273 at 7 (citing and then quoting Strickland, 466 U.S. at 687, 689) (internal quotation marks omitted).  With respect to the second prong, the prejudice prong, the Court of Appeals stated Petitioner needed to demonstrate that counsel's deficient performance prejudiced the defense, more specifically, "that there is a reasonable probability[, a probability sufficient to undermine confidence in the outcome,] that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 7-8 (internal quotation marks and citation omitted) (quoting Strickland, 466 U.S. at 694).  The Court of Appeals further noted that, if Petitioner failed to establish one prong, the court was not required to address the other prong.  Id. at 8 (citing and quoting Strickland, 466 U.S. at 697) (internal quotation marks omitted).

The Court of Appeals agreed with the second PCR motion court that Petitioner's trial counsel did not provide ineffective assistance by failing to present any of the three witnesses at trial.  With respect to the performance prong, the Court of Appeals found the witnesses were not

credible, based on the second PCR motion court's findings, and would not "have produced a viable defense and, at best, would only have served as an attempt to impeach certain of the State's witnesses at trial."[18] Id. at 10, 9, respectively.  Furthermore, the Court of Appeals agreed with the second PCR motion court that Petitioner's trial counsel's "strategy was sound (focusing argument at trial that [Petitioner] may be guilty of second-degree murder but not first-degree murder), particularly given [Petitioner]'s admission to police that he had, in fact, shot [Victim]." Id. at 11. Moreover, Petitioner did not satisfy the prejudice prong with respect to his trial counsel's failure to present any of the three witnesses at trial, the Court of Appeals reasoned, because the evidence of Petitioner's guilt was "overwhelming." Id. at 10, 11.

The Court of Appeals issued its mandate on June 1, 2016.[19]  Petitioner then filed his habeas petition.

## II. Grounds for relief

Petitioner seeks habeas relief on five grounds.  Petitioner claims that the Missouri Court of Appeals' decision upholding the trial court's denial of Petitioner's motion to suppress statements and admission of his statements made during Sergeant Rice's third interview violated his Fifth Amendment and Fourteenth Amendment right to remain silent (Ground One).  Specifically, Petitioner argues his statement "I still don't feel like talking" unequivocally invoked his right to remain silent and the state court's contrary decision constitutes an unreasonable application of clearly established federal law and is based on an unreasonable determination and application of the facts.

---

[18]  With respect to witnesses, Mike O'Neal and Donna Williams, the Missouri Court of Appeals further stated their testimony was inconsistent.  O'Neal v. State, WD78273, mem. at 9-10, Resp'ts Ex. I [ECF No. 10-10].

[19]  See Mandate issued in O'Neal v. State, WD78273 on June 1, 2016, Resp'ts Ex. K [ECF No. 10-11].

For his second, third, and fourth grounds for relief, Petitioner asserts that his trial counsel did not provide effective assistance, in violation of the Sixth and Fourteenth Amendments, by failing to investigate and call as a witness at trial:  Mike O'Neal (Ground Two), Mr. Huskey (Ground Three), and Ms. Williams (Ground Four).  Petitioner contends Mike O'Neal's testimony would have contradicted trial testimony of Mr. Forbes and Mr. Carlson (Ground Two); Mr. Huskey's testimony would have contradicted trial testimony of Mr. Forbes (Ground Three); and Ms. Williams' testimony would have contradicted trial testimony of Mr. Carlson (Ground Four). Petitioner argues that the Court of Appeals' decision finding his trial counsel did not provide ineffective assistance of counsel in failing to investigate and present the testimony of these three individuals was an unreasonable interpretation of <u>Strickland</u>, as well as an unreasonable determination of the facts.

Petitioner further states "each of the [ineffective-assistance-of-trial-counsel] grounds [for relief] is sufficiently prejudicial to require reversal, [but] alternatively requests that the court consider whether the cumulative effect of the grounds sustained is sufficiently prejudicial to require relief."  Pet'r pet'n at 18 n.3 [ECF No. 1].  Additionally, with respect to his ineffective-assistance-of-trial-counsel claims, Petitioner contends they are "either fully exhausted and preserved, or [Petitioner] can demonstrate legal cause [and] prejudice for failing to exhaust and preserve them." <u>Id.</u>

For his fifth ground, Petitioner asserts that his second PCR motion attorney provided ineffective assistance of counsel in violation of Petitioner's Sixth and Fourteenth Amendment rights by failing to litigate in the second PCR motion proceeding the ineffective assistance of counsel provided by Petitioner's attorney during the first PCR motion proceeding.  In particular, Petitioner urges his first PCR motion counsel provided ineffective assistance by failing to advise

him of the risks of withdrawing his guilty plea (and negotiated sentence) to the charge of second-degree murder.   Petitioner contends his second PCR motion attorney provided ineffective assistance of counsel by including the claim regarding Petitioner's first PCR motion attorney in Petitioner's amended PCR motion but withdrawing it at the commencement of the evidentiary hearing.  Petitioner asserts that, under Martinez v. Ryan, 566 U.S. 1 (2012), he is entitled to develop and present this ground for relief in this Court.  Petitioner states, with respect to this ground, that "an evidentiary hearing will be necessary."

Respondents counter that the Missouri Court of Appeals considered Petitioner's first four grounds on their merits and its decisions are not contrary to or an unreasonable application of clearly established federal law, are entitled to deference, and are supported by the record.   In response to Petitioner's contention the Missouri Court of Appeals unreasonably determined the facts, Respondents argue that Petitioner has not met his burden to show by clear and convincing evidence that the presumption of correctness of the state court's factual findings does not apply. 28 U.S.C. § 2254(e)(1).  With respect to Petitioner's fifth ground for relief arising out of his PCR motion counsel's alleged ineffective assistance, Respondents contend the ground is not cognizable in a Section 2254 proceeding, because "[u]nder the mandatory [statutory] provision[],'" 28 U.S.C. § 2254(i), "this Court is without power to consider or grant relief on [Petitioner's fifth ground] and therefore the [ground] must be denied."

Before addressing the merits of any ground for relief, the Court analyzes:  (1) whether the Court is procedurally barred from considering the merits of part of one of Petitioner's ineffective-assistance-of-trial-counsel claims because Petitioner did not properly present that claim to the state courts and (2) whether Ground Five is cognizable in a Section 2254 proceeding under Section 2254(i) and related authority.

### III. Discussion

A.  Procedural default with respect to part of one of Petitioner's ineffective-assistance-of-
     trial-counsel claims (Ground Two)

Petitioner urges, with respect to his ineffective-assistance-of-trial-counsel claims, that those grounds for relief are "either exhausted and preserved, or [Petitioner] can demonstrate legal cause [and] prejudice for failing to exhaust and preserve them."  Pet'r pet'n at 18 n.3 [ECF No. 1]. One of Petitioner's ineffective-assistance-of-trial-counsel claims is subject to analysis for procedural default in part.  In Ground Two Petitioner claims his trial attorney provided ineffective assistance by failing to investigate and present Mike O'Neal as a witness at trial to contradict the testimony of two witnesses:  Mr. Forbes and Mr. Carlson.  The Missouri Court of Appeals explicitly did not address this claim with respect to Mr. Forbes because Petitioner did not present that part of the claim to the second PCR motion court.[20]  Therefore, this Court considers whether that is a procedural default barring this Court from considering the merits of that claim.

(1) Procedural default

A prisoner in custody under the judgment and sentence of a state court may seek habeas relief "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a); see also 28 U.S.C. §§ 2241(c)(3), 2241(d).  Before seeking federal habeas relief under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254, a habeas petitioner "must first 'exhaust his state law remedies and fairly present the facts and substance of his habeas claim to the state court.'"  Carney v. Fabian, 487 F.3d 1094, 1096 (8th Cir. 2007) (quoting Middleton v. Roper, 455 F.3d 838, 855 (8th Cir. 2006)); accord Nash v. Russell, 807 F.3d 892, 898 (8th Cir. 2015) (citing Baldwin v. Reese, 541

---

[20]  The Missouri Court of Appeals addressed the merits of Petitioner's claim that his trial counsel's failure to present Mike O'Neal to contradict Mr. Carlson's testimony was ineffective assistance of counsel.

U.S. 27, 29 (2004)).  "'If a petitioner has not presented his habeas corpus claim to the state court, the claim is generally defaulted.'"  Carney, 487 F.3d at 1096 (quoting Barrett v. Acevedo, 169 F.3d 1155, 1161 (8th Cir. 1999) (en banc)).

Importantly, a petitioner must present the claim to the state courts "in accordance with state procedural rules."  Arnold v. Dormire, 675 F.3d 1082, 1086-87 (8th Cir. 2012) (internal quotation marks omitted) (quoting Beaulieu v. Minnesota, 583 F.3d 570, 573 (8th Cir. 2009)); accord Sawyer v. Whitley, 505 U.S. 333, 338 (1992) (generally, a federal habeas court may not reach the merits of a federal constitutional claim procedurally defaulted due to a petitioner's failure "to follow applicable state procedural rules in raising the claims" in state court).  To satisfy the exhaustion requirement, a state prisoner "must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process."  Grass v. Reitz, 643 F.3d 579, 584 (8th Cir. 2011) (internal quotation marks omitted) (quoting O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999)).

In Missouri state court proceedings, a litigant must raise constitutional claims at the earliest opportunity and preserve them throughout the proceedings.  Kirk v. State, 520 S.W.3d 443, 457 (Mo. 2017) (en banc) (quoting State v. Liberty, 370 S.W.3d 537, 546 (Mo. 2012) (en banc)).  Importantly, "[u]nder Missouri law, an appeal to the intermediate state appellate court sufficiently exhausts state remedies to permit federal habeas review under section 2254."  Taylor v. Roper, 561 F.3d 859, 861 n.2 (8th Cir. 2009).

A post-conviction proceeding is the exclusive procedure for pursuing an ineffective-assistance-of-counsel claim in a Missouri state court; a court's decision on a post-conviction motion is subject to appeal; and a litigant may not file successive post-conviction motions.  Moore-El v. Luebbers, 446 F.3d 890, 896 (8th Cir. 2006); Mo. S. Ct. Rule 29.15.  To exhaust an

ineffective-assistance-of-counsel claim, the claim must be raised in the post-conviction appeal. See, e.g., Osborne v. Purkett, 411 F.3d 911, 919 (8th Cir. 2005).

When, however, a state appellate court "rejects the claim on procedural grounds, the claim is barred in federal court unless one of the exceptions" applies.   Harrington v. Richter, 562 U.S. 86, 103 (2011); Harris v. Reed, 489 U.S. 255, 261-62 (1989) (a state court must "actually . . . rel[y] on the procedural bar as an independent basis for its disposition" of the claim for the federal habeas court to be procedurally barred from considering the merits of the claim absent a showing of cause and prejudice or a fundamental miscarriage of justice (internal quotation marks and citation omitted)); Stephen v. Smith, 963 F.3d 795, 800 (8th Cir. 2020) (not reaching the merits of a procedurally defaulted claim the "state [appellate] court declined to hear because [(1)] the prisoner failed to abide by a state procedural rule" requiring the prisoner to present it to the lower court in a motion and [(2)] the prisoner did not attempt to meet the cause and prejudice or actual innocence standards" (internal quotation marks omitted) (quoting Martinez, 566 U.S. at 9)).

Petitioner did not present in his amended PCR motion his ineffective-assistance-of-trial-counsel claim based on the argument that Mike O'Neal's testimony would contradict Mr. Forbes' testimony.[21]  Petitioner included this claim in his PCR appeal.[22]  The Missouri Court of Appeals, however, clearly declined to consider the claim because Petitioner had not presented it to the second PCR motion court.[23]  Because the Court of Appeals declined to consider this aspect of one of Petitioner's ineffective-assistance-of-trial-counsel claims due to Petitioner's failure to present the claim to the second PCR motion court, it is procedurally defaulted.  See, e.g., Stephen, 963

---

[21]  See Pet'r am. PCR mot. at 2-3, PCR Legal File, Resp'ts Ex. F at 24-25 [ECF No. 10-6].

[22]  See Pet'r Br. on PCR appeal, Resp'ts Ex. G, at 14 [10-7].

[23]  See O'Neal, WD78273, Resp'ts Ex. I, at 6 n. 4 [ECF No. 10-9].

F.3d at 800.  Therefore, this Court may not consider the merits of this procedurally defaulted ineffective-assistance-of-trial-counsel claim unless Petitioner "shows cause and prejudice or that he is actually innocent of the charges."  Id.  (quoting Skillicorn v. Luebbers, 475 F.3d 965, 976 (8th Cir. 2007)).  More specifically, "[t]o overcome [a] procedural default, [a petitioner] must show [either] cause for not presenting the [procedurally defaulted claim] . . . , and prejudice from the failure, or a fundamental miscarriage of justice – meaning that [the petitioner] is actually innocent." Storey v. Roper, 603 F.3d 507, 523-24 (8th Cir. 2010) (citing Coleman v. Thompson, 501 U.S. 722, 748, 750 (1991) and Schlup v. Delo, 513 U.S. 298, 324-27 (1995)).  Petitioner did not present argument regarding the fundamental miscarriage of justice test, so the Court discusses only the cause and prejudice test urged by Petitioner.

(2) Cause and prejudice

Petitioner contends he is able to establish cause and prejudice for any ineffective-assistance-of-trial-counsel claim he failed "to exhaust and preserve."  "Cause for a procedural default exists where 'something external to the petitioner, something that cannot fairly be attributed to him[,] . . . 'impeded [his] efforts to comply with the State's procedural rule.'" Maples v. Thomas, 565 U.S. 266, 280 (2012) (alterations and emphasis in original) (quoting Coleman, 501 U.S. at 753).  Notably, "the precise contours of the cause requirement have not been clearly defined."  Ivy v. Caspari, 173 F.3d 1136, 1140 (8th Cir. 1999).  If a petitioner does not establish cause for the procedural default, a habeas court need not determine whether the petitioner demonstrated the necessary prejudice.  Oglesby v. Bowersox, 592 F.3d 922, 926 (8th Cir. 2010).

Petitioner has not asserted or demonstrated any matter external to and not fairly attributed to him that impeded his ability to include in his amended PCR motion his ineffective-assistance-of-trial-counsel claim arising out of Petitioner's trial counsel's failure to present Mike O'Neal to

contradict the trial testimony of Mr. Forbes.  Therefore, Petitioner has failed to demonstrate cause for the procedural default of his claim that his trial counsel provided ineffective assistance by not presenting at trial the testimony of Mike O'Neal to contradict Mr. Forbes' testimony.  In the absence of a showing satisfying the cause requirement, this Court need not address the prejudice requirement.  Petitioner has not established the cause and prejudice necessary for this Court to address the merits of this procedurally defaulted ineffective-assistance-of-trial-counsel claim.

     B.  <u>Cognizability – ineffective assistance of post-conviction motion counsel (Ground Five)</u>

     For his fifth ground for relief, Petitioner asserts that his attorney during his second post-conviction motion proceeding provided ineffective assistance of counsel by failing to litigate an allegedly ineffective assistance of counsel claim with respect to his attorney in his first post-conviction motion proceeding.  In particular, Petitioner urges his attorney during the first post-conviction motion proceeding failed to advise Petitioner "of the risks of withdrawing his guilty plea and negotiated sentence to the charge of second-degree murder."  Petitioner contends he "did not know he would be subject to the original charge of murder in the first degree and the mandatory punishment for that charge of death or life without the possibility of probation or parole."  Arguing he was prejudiced both by his attorney's challenged conduct during his first post-conviction motion proceeding and "because he is now serving life without the possibility of parole, when previously he was parole-eligible," Petitioner asserts "he would not have proceeded with" the post-conviction motion challenging his guilty plea and sentence "[h]ad he fully understood the risk of challenging his [first] judgment and sentence."  Pet'r pet'n at 22-23 [ECF No. 1].  Petitioner seeks an evidentiary hearing to resolve this ground.

     Respondents counter that this ground for relief, which arises out of the alleged ineffective assistance of post-conviction motion counsel, is not cognizable in a Section 2254 habeas

proceeding. In particular, Respondents urge that "[u]nder the mandatory provisions of the AEDPA," specifically 28 U.S.C. § 2254(i), "this Court is without power to consider or grant relief on" Petitioner's fifth ground for relief.  Therefore, Respondents contend, Ground Five must be denied.[24]

Section 2254(i) states in full:  "The ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings shall not be a ground for relief in a proceeding arising under Section 2254."  This statutory provision unambiguously forecloses the consideration and granting of habeas relief in a Section 2254 proceeding based on a PCR attorney's allegedly ineffective assistance of counsel.  See Campbell v. Houtzdale, CV 17-1305, 2017 WL 3442998, at *1 (3rd Cir. Apr. 26, 2017) ("To the extent that [the petitioner sought in his] habeas petition . . . to raise a freestanding claim alleging that counsel was ineffective in [his] state court post-conviction proceedings, reasonable jurists would not debate that this claim . . . fails to raise a cognizable habeas issue.  See 28 U.S.C. § 2254(i)"); Graves v. Cassady, 4:12-CV-1093-SPM, 2015 WL 5560356, at *16 (E.D. Mo. Sept. 21, 2015) ("It is well established that a claim of ineffective assistance of post-conviction relief counsel is not cognizable on habeas review," citing § 2254(i), Coleman, 501 U.S. at 752, and Martinez, 566 U.S. at 16).  Accord Samples v. Ballard, 860 F.3d 266, 275–76 (4th Cir. 2017) (citing Section 2254(i) as support for the Fourth Circuit's statement that "a freestanding claim of ineffective assistance of state habeas counsel . . . is not a permissible avenue of relief in a federal habeas petition"); Chavez v. Secretary, Fla. Dep't of Corr., 742 F.3d

_____

[24] Petitioner states that Respondents: (1) argue the "ineffective assistance of post-conviction counsel claims [in Ground Five] are procedurally barred by 28 U.S.C. § 2254(i)" and (2) do not address the Supreme Court's Martinez decision "which can overcome that procedural bar."  Petitioner's characterization of Respondents' argument is incorrect.  Respondents do not contend that the statutory language they rely on procedurally bars this Court's consideration of the merits of Petitioner's fifth ground for relief.  Rather, Respondents urge that the language of Section 2254(i) bars any consideration by this Court of the claim in Ground Five because the statutory language renders this ground not cognizable (i.e., not "capable of being judicially heard and determined") as a basis for granting habeas relief under Section 2254.  See definition of "cognizable" in Merriam-Webster.com Dictionary, Merriam-Webster (available at https://www.merriam-webster.com/dictionary/cognizable (last visited on Dec. 16, 2020)).

940, 944-45 (11th Cir. 2014) ("The Supreme Court has long held that there is no constitutional right to counsel in post-conviction proceedings, even in capital cases, which necessarily means that a habeas petitioner cannot assert a viable, freestanding claim for the denial of the effective assistance of counsel in such proceedings.  See Coleman . . . , 501 U.S. [at] 752; see also 28 U.S.C. § 2261(e) ("The ineffectiveness or incompetence of counsel during State or Federal postconviction proceedings in a capital case shall not be a ground for relief in a proceeding arising under section 2254")).  Therefore, as Respondents urge, Petitioner's fifth ground for relief is not cognizable.

Petitioner argues, however, that under Martinez, supra, "he is entitled to develop and present this ground for relief in this [C]ourt."  Pet'r pet'n at 23 [ECF No. 1]; see also Pet'r reply at 8 [ECF No. 19] ("Martinez should apply [in this case] and make [Petitioner's] claims of ineffective assistance of post-conviction counsel cognizable").  In Martinez, supra, the Supreme Court held the ineffective assistance of PCR motion counsel may, under certain circumstances, establish cause to avoid a procedural default of an ineffective-assistance-of-trial-counsel claim. Martinez, 566 U.S. at 9.  Notably, in that decision the Supreme Court expressly stated Section 2254(i) does not permit a petitioner to use the alleged ineffective assistance of PCR motion counsel as a ground for habeas relief under Section 2254.  Id. at 17 (Section 2254(i) "precludes [a petitioner] from relying on the ineffectiveness of his postconviction attorney as a 'ground for relief'"); see also id. at 16 (characterizing the cause exception enunciated in Martinez as an "equitable ruling," rather than a constitutional one, and noting that, in relevant part, "[a] constitutional ruling would provide defendants a freestanding constitutional claim to raise") and id. at 17 (pointing out that the petitioner in Martinez "relie[d] on the ineffectiveness of his postconviction attorney [as cause] to excuse his failure to comply with Arizona's procedural rules, not as an independent basis for overturning his conviction"); accord Martel v. Clair, 565 U.S. 648,

662 n.3 (2012) (noting that "most naturally read, § 2254(i) prohibits a court from granting substantive habeas relief on the basis of a lawyer's ineffectiveness in post-conviction proceedings, not from substituting counsel on that ground").  Based on the proscriptive language of Section 2254(i) disallowing use of any alleged ineffective assistance of PCR counsel as a basis for granting habeas relief under Section 2254, which the Supreme Court reiterated without qualification in the Martinez decision, the Martinez decision does not render cognizable in this proceeding Petitioner's fifth ground for habeas relief arising out of the alleged ineffectiveness of his PCR motion counsel. See Smith v. Warden, Toledo Corr. Inst., 780 Fed. Appx. 208, 224 (6th Cir. 2019) (unpublished) (noting "though ineffective assistance of postconviction counsel is not a freestanding claim" for habeas relief under Section 2254, under the Martinez decision, such assistance "can provide cause under certain circumstances for a petitioner to overcome procedural default");[25] Samples, 860 F.3d at 276 ("Martinez did not create . . . a freestanding claim" of the ineffective assistance of state habeas counsel); Lambrix v. Secretary, Fla. Dep't of Corr., 756 F.3d 1246, 1249 (11th Cir. 2014) ("Martinez did not create a freestanding claim for relief based on ineffective state collateral counsel").

In support of his position that Martinez should be extended to allow this Court to conclude the fifth ground is cognizable and to consider the merits of that ground for relief, Petitioner characterizes his attorney in his first "post-conviction [motion proceeding as] performing a pretrial function that is typically performed by trial counsel," i.e., providing information about the consequences of pursuing a position in court.  Specifically, Petitioner points to that attorney's

---

[25] The Eastern District of Missouri has also arrived at the same conclusion in an earlier decision.  See Brooks v. Wallace, 4:16 CV 208 (JMB), 2018 WL 999971, at *7 (E.D. Mo. Feb. 21, 2018) ("Martinez announced an equitable modification of Coleman [v. Thompson, 501 U.S. 722 (1991)] to excuse, in limited circumstances, the procedural default of ineffective-[assistance-of-]trial-counsel claims when post-conviction [motion] counsel was ineffective for failing to raise the claims in the state [PCR] proceedings.  Martinez, 566 U.S. at 9.  Martinez did not, however, create a freestanding claim for habeas relief based on the alleged ineffective assistance of state post-conviction counsel").

alleged failure to advise Petitioner he would be subject to a first-degree murder charge and its related mandatory sentencing options if he successfully challenged his first conviction and sentence.    Therefore, Petitioner urges, his first post-conviction motion attorney's alleged "ineffective assistance was a trial-related error" that should be cognizable in this Section 2254 proceeding because Sixth Amendment claims

> due to [the] ineffective assistance of trial counsel allege 'trial error,' or 'trial-related error.'  See, e.g., Chadwick v. Iowa, 951 F.2d 863 (8th Cir. 1991) and Boyde v. California, 494 U.S. 370 (1990) (using the phrase "trial-related error" in the context of ineffective assistance of counsel claims).

Asserting trial-related errors are not limited to those occurring "at trial" (emphasis in original), Petitioner states the ineffective assistance of trial counsel may occur "during the plea-bargaining pretrial stage."  In particular, Petitioner contends,

> [t]he defendant who rejects a plea bargain and chooses to proceed to trial after insufficient advice from counsel has experienced trial-related error, and is prejudiced by it.  See Lafler v. Cooper, 566 U.S. 156 (2012) (holding that counsel's performance was deficient because counsel advised defendant to reject a plea offer on the grounds that he would not be convicted at trial), Garmon v. Lockhart, 938 F.2d 120 (8th Cir. 1991) (holding that counsel's performance was deficient because he misadvised defendant as to defendant's parole eligibility, and that defendant was prejudiced because he chose to [plead guilty rather than] go to trial as a result of that misinformation), and United States v. Hernandez, 450 F. Supp.2d 950 (N. D. Iowa 2006) (holding that counsel's performance was deficient because counsel failed to advise defendant fully of the risks and consequences of going to trial as opposed to pleading guilty, and that defendant was prejudiced as a result).

Petitioner declares his fifth ground for relief "follows the familiar pattern" of Lafler, Garmon and Hernandez," and, therefore, the Court should consider it on its merits under Strickland.

The Court declines to further discuss this argument upon finding no basis, in either the language of Section 2254(i) or the language and circumstances of Martinez and its progeny, to allow a PCR attorney's alleged acts or omissions to support the granting of habeas relief under Section 2254 due to the characterization of the post-conviction attorney's conduct as "trial error"

or "trial-related error."  Similarly, the Court finds unpersuasive Petitioner's arguments that the Court should conclude the fifth ground for relief is cognizable based on the equitable principles underlying the <u>Martinez</u> holding and the rarity of the circumstances here.   Neither the circumstances of this case nor Petitioner's arguments support the creation of a presently non-existent and proscribed basis for habeas relief under Section 2254 due to the alleged conduct of an attorney in a state post-conviction proceeding.  The Court denies Petitioner's fifth ground for relief as not cognizable and, because the Court is not considering that ground for relief, denies Petitioner's related request for an evidentiary hearing to resolve that ground.

    C.  <u>Merits (Grounds One through Four)</u>

        (1) Standard of review

As stated earlier, a prisoner in custody under the judgment and sentence of a state court may only seek habeas relief on the ground his custody violates the United States Constitution, laws or treaties.  28 U.S.C. § 2254(a); <u>see also</u> 28 U.S.C. §§ 2241(c)(3), 2241(d).  When considering a state prisoner's habeas petition, a federal court is bound by the AEDPA, to exercise "only limited and deferential review of underlying state court decisions."   <u>Nash</u>, 807 F.3d at 897 (internal quotation marks omitted) (quoting <u>Worthington v. Roper</u>, 631 F.3d 487, 495 (8th Cir. 2011)).  A federal court may not grant habeas relief to a state prisoner unless a state court's adjudication of the merits of a claim (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

A state court decision is contrary to clearly established Supreme Court precedent if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question

of law or . . . decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412-13 (2000) ("Taylor"). If a state court's decision is not "contrary to" clearly established law, then the "unreasonableness" standard applies, which is "meant to be difficult to meet, and 'even a strong case for relief does not mean the state court's contrary conclusion was unreasonable.'" Williams v. Roper, 695 F.3d 825, 831 (8th Cir. 2012) (quoting Harrington, 562 U.S. at 102). A state court decision is an unreasonable application of clearly established federal law if it "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular . . . case." Taylor, 529 U.S. at 407-09; see also id. at 413. The test of reasonableness is an objective one. Id. at 409-10; accord White v. Woodall, 572 U.S. 415, 419 (2014).

The "clearly established Federal law" requirement of habeas review under Section 2254(d)(1) requires the habeas court to consider only United States Supreme Court precedent in force when a state court issues its decision. Greene v. Fisher, 565 U.S. 34, 38-40 (2011) (relying on Cullen v. Pinholster, 563 U.S. 170, 182 (2011)); accord Taylor, 529 U.S. at 412. State courts are not required to cite to Supreme Court cases, "'so long as neither the reasoning nor the result of the state-court decision contradicts them.'" Revels v. Sanders, 519 F.3d 734, 739 (8th Cir. 2008) (quoting Early v. Packer, 537 U.S. 3, 8 (2002) (per curiam)). Importantly, when reviewing a matter under Section 2254(d)(1), a federal habeas court "is limited to the record that was before the state court that adjudicated the claim on the merits." Cullen, 563 U.S. at 181.

The state court record is also significant when a federal habeas court analyzes under Section 2254(d)(2) whether a state court decision on the merits of a claim "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." A federal habeas court "accord[s] the state . . . court substantial deference" and does not supersede

the state court's factual determination if "reasonable minds reviewing the record might disagree about the finding in question." Brumfield v. Cain, 576 U.S. 305, 313-14 (2015) (internal quotation marks and citation omitted).   For purposes of Section 2254(d)(2), "a state-court factual determination is not unreasonable merely because [a] federal habeas court would have reached a different conclusion in the first instance." Wood v. Allen, 558 U.S. 290, 301 (2010).

Importantly, "a determination of a factual issue made by a State court [is] presumed to be correct" unless the habeas petitioner rebuts the presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).  The presumption of correctness applies to the factual determinations made by a state court at either the trial or appellate levels, Smulls v. Roper, 535 F.3d 853, 864-65 (8th Cir. 2008) (en banc), and to a state court's implicit findings of fact, Grass v. Reitz, 749 F.3d 738, 743 (8th Cir. 2014).  Likewise, federal habeas courts defer to state court credibility determinations, Smulls, 535 F.3d at 864, and to "[a] state court's findings of fact made in the course of deciding" an ineffective-assistance-of-counsel claim, Odem v. Hopkins, 382 F.3d 846, 849 (8th Cir. 2004).

Although the Supreme Court has not yet clarified the relationship between the "unreasonable" provision of Section 2254(d)(2) and the "presumed correct" provision of Section 2254(e)(1), see, e.g., Burt v. Titlow, 571 U.S. 12, 19 (2013); Velez v. Clarinda Corr. Facility, 791 F.3d 831, 834 n.1 (8th Cir. 2015), Eighth Circuit authority supports the granting of habeas relief under Section 2254(d)(2) when a petitioner provides "clear and convincing evidence that the state court's presumptively correct factual finding [that is material to its decision on the merits] lacks evidentiary support. 28 U.S.C. § 2254(e)(1)." Trussell v. Bowersox, 447 F.3d 588, 591 (8th Cir. 2006); accord Jones v. Luebbers, 359 F.3d 1005, 1011 (8th Cir. 2004) ("a state court decision involves 'an unreasonable determination of the facts in light of the evidence presented in state court proceedings,' 28 U.S.C. § 2254(d)(2), only if it is shown that the state court's presumptively

correct factual findings do not enjoy support in the record.  28 U.S.C. § 2254(e)(1)").  Put another way, a petitioner is entitled to relief under the AEDPA if the state court decision "at issue is based on factual determinations that could not reasonably be derived from the state court evidentiary record."  Velez, 791 F.3d at 834.

(2)  Invocation of the right to remain silent (Ground One)

In his first ground, Petitioner claims that his right to remain silent as protected by the Fifth and Fourteenth Amendments was violated by the Missouri Court of Appeals' decision on direct appeal upholding the trial court's denial of Petitioner's motion to suppress statements and the admission at trial of statements Petitioner made during Sergeant Rice's third interview after Petitioner invoked his right to remain silent during that interview.  Petitioner argues the Court of Appeals' decision (1) is an unreasonable application of the United States Supreme Court's decisions in Miranda, supra, Smith v. Illinois, 469 U.S. 91 (1984) (per curiam), and Mosley, supra; and (2) is based on "an unreasonable determination and application of the facts in the record." Petitioner further contends his statement "I still don't feel like talking" unequivocally invoked his Fifth Amendment right to remain silent based on its context and language.

Respondents counter that the analysis of the Missouri Court of Appeals in rejecting Petitioner's direct appeal challenge to the admission at trial of statements he made during the third interview is not contrary to[26] nor an unreasonable application of clearly established federal law, is entitled to deference, and has support in the record.  With respect to Petitioner's contention that the Missouri Court of Appeals' decision involved an unreasonable determination or application of the facts, Respondents argue Petitioner has failed to satisfy his burden to establish that the presumption of correctness of a state court's factual findings does not apply.  Finally, Respondents

---

[26] Petitioner does not argue the Court of Appeals' decision on direct appeal is contrary to clearly established federal law.  Therefore, this Court need not discuss that issue.

contend Petitioner is not entitled to habeas relief, even if the Court of Appeals' adjudication of this claim was unreasonable and this ground is subject to de novo review, because Petitioner's alleged invocation of his right to silence during the third interview was indirect, ambiguous, and equivocal, rather than clear and unambiguous.

The Fifth Amendment protects against self-incrimination by guaranteeing that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself."  U.S. Const. amend. V.  The protection against self-incrimination applies, through the Fourteenth Amendment, to the States.  Malloy v. Hogan, 378 U.S. 1, 6 (1964).

With respect to the use during a criminal trial of statements a defendant made during police interrogations, the Supreme Court has held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless [the prosecution] demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination."  Miranda, 384 U.S. at 444.  The Supreme Court defined "custodial interrogation" as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."  Id. (footnote omitted).  The procedural safeguards required by Miranda include a warning given to the person questioned, "[p]rior to any questioning, . . . that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed."[27]  Id.

---

[27] Later in the Miranda decision, the Supreme Court described the required warning as follows:

> [the interrogated person] must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

Miranda v. Arizona, 384 U.S. 436, 479 (1966).

After the person in custody who is being questioned receives the required notice of the right to remain silent, the person has what the Supreme Court in Mosley characterized as "a critical safeguard:" "'a right to cut off questioning.'"  Mosley, 423 U.S. at 103-04 (quoting Miranda, 384 U.S. at 474).  More specifically, Miranda states that "[i]f the individual indicates in any manner, at any time . . . during questioning, that he wishes to remain silent, the interrogation must cease." Miranda, 384 U.S. at 473-74 (footnote omitted).  "[T]he admissibility of statements obtained after [a] person in custody has decided to remain silent depends under Miranda on whether his right to cut off questioning was scrupulously honored." Mosley, 423 U.S. at 104 (internal quotation marks and footnote omitted).

A person's post-Miranda invocation of the right to remain silent must be unambiguous. Berghuis v. Thompkins, 560 U.S. 370, 380-82 (2010).  The Supreme Court concluded the petitioner's alleged invocation of his right to silence ("by not saying anything for a . . . period of time")[28] was not effective to invoke his right to silence and cut off questioning.  Id. at 381.  Instead, the Supreme Court observed, the petitioner would have invoked his right to cut off questioning by stating either "that he wanted to remain silent or that he did not want to talk with the police."  Id. at 382.  Because the petitioner "made [n]either of these simple, unambiguous statements . . . he did not invoke his right to remain silent" during his questioning.  Id.  Due to the Supreme Court's 2010 decision in Berghuis, clearly established federal law at the time of the Missouri Court of Appeals' 2013 decision in Petitioner's direct appeal required an interrogated person to unambiguously or unequivocally invoke his right to silence.

---

[28] Specifically, the Supreme Court described the three-hour interrogation as consisting of two hours and forty-five minutes during which the petitioner was "'[l]argely' silent" (a period involving "a few limited verbal responses, . . . such as 'yeah,' 'no,' or 'I don't know,'" an occasional head nod, a refusal of an offered peppermint, and a statement his "chair . . . 'was hard'"), followed by fifteen minutes of conversation during which the petitioner: (1) responded, "yes" to a police officer's question whether the petitioner "pray[ed] to God to forgive [him] for shooting that boy down?" and (2) "refused to make a written confession." Berghuis v. Thompkins, 560 U.S. 370, 375-76 (2010).

The Supreme Court in <u>Berghuis</u> also concluded "there is no principled reason to adopt different standards for determining when an accused has invoked the <u>Miranda</u> right to remain silent and the <u>Miranda</u> right to counsel." <u>Berghuis</u>, 560 U.S. at 381.  To ascertain the ambiguity of an individual's invocation of the <u>Miranda</u> right to counsel, a court may analyze only the invocation itself and the circumstances leading up to the invocation; a court may not consider the individual's subsequent responses to continued police questioning.  <u>Smith</u>, 469 U.S. at 97 (rejecting as "unprecedented and untenable" the analysis of the ambiguity of an interrogated individual's request for counsel that was derived by looking at the individual's subsequent responses to continued police questioning rather than at the invocation and the circumstances leading up to the invocation).  Therefore, clearly established federal law requires a court to analyze the ambiguity of an interrogated individual's post-<u>Miranda</u> invocation of the right to silence based only on the invocation itself and the circumstances leading up to the invocation.  "Where nothing about the [invocation of the right to silence] or the circumstances leading up to the [invocation] would render it ambiguous, all questioning must cease."  <u>Smith</u>, 469 U.S. at 98.  Put another way, "under the clear logical force of settled precedent, an accused's <u>post[-invocation]</u> responses to further interrogation may not be used to cast retrospective doubt on the clarity of the initial [invocation] itself."  <u>Id.</u> at 100 (emphasis in original).

In concluding Petitioner's statement during the third interview with Sergeant Rice was ambiguous, the Missouri Court of Appeals on direct appeal described the relevant portion of Sergeant Rice's third interview of Petitioner as follows:

> [After Sergeant Rice advised Petitioner of his <u>Miranda</u> rights and Petitioner signed the Notification of Rights form,] Sergeant Rice informed [Petitioner] that he had spoken with [Mr.] Carlson and [Petitioner]'s sister Kelly [O'Neal].  Sergeant Rice continued:

Rice: . . . So, obviously between you know what your sister has told us, and what [Mr. Carlson] has said there's you know there's some things that again that [we] need to clear up. Okay?

[Petitioner]: Mm hmm.

Rice: Do you know what I'm talking about?

[Petitioner:] (inaudible) talking about. I still don't feel like talking but, [I] feel terrible.

Rice: I'm, I'm sure you do.

[Petitioner]: You really don't know, you don't even know.

Rice: How, how do you feel right now?

[Petitioner]: Terrible, I want to die too; I swear I do them girls without their mom.

Sergeant Rice then asked [Petitioner] whether he "mean[t] for this to happen or was it just an accident," to which [Petitioner] responded that it was an accident. Sergeant Rice then emphasized (as he had during the prior interrogations) that it was important for [Petitioner] to tell his side of the story, fully and truthfully. [Petitioner] told Sergeant Rice that "the only way I'll do it" is if Sergeant Rice turned off the tape recorder. Sergeant Rice complied. Apparently, [Petitioner] then told Sergeant Rice his version of events. At 1:26 p.m., Sergeant Rice turned the tape recorder back on. Then, with Sergeant Rice's prompting, [Petitioner] repeated his account: that he had obtained the rifle and gone to [Victim]'s house with the intent to kill . . . , the father of Amanda's child, and then to kill himself; but that when he got to the house and pointed the gun at [Victim], he became very upset when she refused to call Amanda or tell him Amanda's whereabouts, and the gun went off.

O'Neal, No. WD74687, at 16 [ECF No. 10-5] (seventh, tenth, eleventh, fifteenth and seventeenth alterations and parentheticals in original). In addition to quoting from and citing to several state court cases, the Court of Appeals quoted from Berghuis's explanation of the reason for requiring an interrogated person to unambiguously invoke his or her right to remain silent. Id. at 17. Then the Court of Appeals discussed Petitioner's reliance on "his isolated statement that 'I still don't feel like talking'" as clearly invoking his right to silence. Id. at 18. Acknowledging that "the

isolated statement on which [Petitioner] relies could be interpreted as an invocation of his right to remain silent, [the Court of Appeals noted] that single remark is not all that [Petitioner] said." Id.

Stating that "courts must look to the full context of a particular statement in order to determine whether a suspect invoked his rights or not," the Court of Appeals analyzed the statement on which Petitioner relied in the context of other aspects of the third interview and concluded the statement was ambiguous. Id. at 18-20. First, the Court of Appeals observed that "[t]he remark [Petitioner] highlights was preceded by Sergeant Rice's statement that 'there's some things that . . . [we] need to clear up.' Sergeant Rice then asked [Petitioner], 'Okay?,' to which [Petitioner] responded affirmatively." Id. at 18. As a result of this aspect of Sergeant Rice's and Petitioner's conversation, the Court of Appeals found that "immediately before saying that 'I still don't feel like talking,' [Petitioner] had indicated that he was willing to participate in a conversation 'to clear up' inconsistencies between his own account of events, and the statements made by [Mr.] Carlson and Kelly O'Neal." Id.

Second, the Court of Appeals discussed what Petitioner said immediately after he allegedly invoked his right to remain silent during the third interview. In particular, the Court of Appeals stated:

> What [Petitioner] said <u>after</u> his purported invocation added further ambiguity. As part and parcel of his statement that he did not "feel like talking," [Petitioner] added:  "but, [I] feel terrible." Even if [Petitioner]'s statement that "I still don't feel like talking" could be considered as an unequivocal statement of his desire not to speak, it is undercut by what followed as part of the same sentence. . . .
>
> Here, [Petitioner]'s use of the conjunction "but" is an equivocation, which suggests that he was experiencing an internal conflict:  while he did not <u>want</u> to talk about what had happened, other factors compelled him to do so.  Moreover, when Sergeant Rice responded to [Petitioner]'s statement that he felt terrible by politely stating "I'm sure you do," [Petitioner] continued to speak, explaining his emotions. Then, after only a single, broad question concerning [Victim]'s murder, [Petitioner] expressed his desire to tell his version of events, so long as the tape recorder was

turned off.  [Petitioner]'s statement that he was willing to tell his story, so long as it was not audio-recorded, was _not_ an invocation of his right to remain silent, but instead permitted Sergeant Rice to continue his questioning.

Thus, in this case [Petitioner] initially stated that it was "Okay" for Sergeant Rice to talk to him to clarify certain issues.  Although he then said that he did not feel like talking, he added "but, I feel terrible," suggesting that he was willing to talk despite his feelings.  [Petitioner] then made clear that he would tell his side of the story, so long as the tape recorder was turned off.  [Petitioner]'s statements exhibit – at most – some ambiguity or equivocation as to whether he wished to invoke his right to remain silent.  In these circumstances, Sergeant Rice was under no obligation to cease questioning, or to seek clarification from [Petitioner] as to how he wished to proceed.

Id. at 18-19 (emphases in original) (footnote omitted) (internal quotation and citation omitted).

Finally, to "further confirm[] that no invocation in fact occurred" (rather than "to undermine an unambiguous invocation [Petitioner] had previously made"), the Court of Appeals described "the concluding exchange" between Sergeant Rice and Petitioner.  Id. at 20.  During that exchange, Sergeant Rice first asked Petitioner if what he had said was "the truth [about] what happened," to which Petitioner responded, "Yes, sir, I swear."  Id. at 19-20.  Sergeant Rice also asked Petitioner if anyone had coerced him or made him "in any way" "say anything against [his] will" to which Petitioner responded, "No sir."  Id. at 20.  For his last question, Sergeant Rice asked Petitioner if he "understand[s] . . . and . . . understood [his] rights through all this [and] we've treated you okay," to which Petitioner responded, "Yes, sir."  Id.

Petitioner argues the Court of Appeals' decision in his direct appeal "was an unreasonable application" of the clearly established federal law set forth in the Supreme Court's decisions in Miranda, Smith, or Mosley, which were all in force when the Court of Appeals issued its decision.  Therefore, this Court must ascertain whether the Court of Appeals applied those decisions to the facts in an objectively unreasonable manner.  Taylor, 529 U.S. at 407-10.  Before discussing whether the Court of Appeals' application of clearly established federal law to the facts was

objectively unreasonable, the Court resolves Petitioner's challenge to the Court of Appeals' decision on the ground it constitutes "an unreasonable determination . . . of the facts in the record."[29]  See Worthington v. Roper, 631 F.3d 487, 497-98 (8th Cir. 2011) (because the state court correctly identified applicable federal law, the habeas court must consider whether the state court unreasonably applied the relevant precedent or determined the facts.)

As noted earlier, in resolving a challenge to the reasonableness of a state court's determination of the facts, this Court accords the state court substantial deference and does not supersede any state court factual determination merely because this Court may have reached a different conclusion in the first instance. Cain, 576 U.S. at 313-14 (if reasonable minds differ about the finding after review of the record, the federal habeas court may not supersede a state court's factual determination); Wood, 558 U.S. at 301.  Moreover, a state court's factual determination, including any factual finding by an appellate court, any implicit finding of fact, and any finding regarding credibility, is presumed correct if the petitioner does not rebut the presumption with clear and convincing evidence that the factual finding lacks evidentiary support in the state court record.

Petitioner has not presented any evidence, much less clear and convincing evidence, that any factual finding of the Court of Appeals in Petitioner's direct appeal lacks evidentiary support in the state court record.  Instead, Petitioner's challenges to the decision in his direct appeal arise out of his disagreement with the factual findings made by the Court of Appeals.  Even if this Court concurred with Petitioner that a factual finding could be reached differently based on the state

---

[29]  Petitioner explicitly challenges the Court of Appeals' decision on Petitioner's direct appeal as "an unreasonable determination and application of the facts in the record" (emphasis added).  The Court need not further address Petitioner's contention the Court of Appeals' decision involved an "unreasonable application" of the facts, because the AEDPA does not mention a state court's "unreasonable application" of facts, only a state court's unreasonable "determination" of facts, as support for the granting of relief under Section 2254.  See, e.g., 28 U.S.C. § 2254(d)(2) and Section 2254(e)(1).

court record, this Court is not free to conclude a contrary determination of a fact by the Court of Appeals is unreasonable due to that disagreement.  See, e.g., Cain, 576 U.S. at 313-14; Wood, 558 U.S. at 301.  Under the circumstances, the decision of the Court of Appeals in Petitioner's direct appeal is not an unreasonable determination of the facts.  Therefore, the Court considers Petitioner's challenge to the reasonableness of the Missouri Court of Appeals' application of clearly established federal law in its decision in Petitioner's direct appeal.

In particular, Petitioner asserts the "context surrounding" the statement "I still don't feel like talking" supports his position [30] that he unequivocally and clearly invoked his Fifth

---

[30]  In support of his position, Petitioner states "courts consider 'the totality of the circumstances,'" citing to the Eighth Circuit's November 7, 1984 decision in the direct appeal in United States v. Udey, 748 F.2d 1231, (8th Cir. 1984).  Pet'r reply at 2 [ECF No. 19].  In Udey, the Eighth Circuit decided that the interrogated defendant had not requested counsel and her "initial request to remain silent was tentative and equivocal.  On this basis the subsequent police-initiated conversations were held not to contravene the accused's constitutional rights."  Id.  The Eighth Circuit then quoted the underlying federal district court's decision regarding "whether or not the waiver of the right to silence was valid."  Id.  The district court concluded that "[c]onsidering the totality of the circumstances, . . . the government has demonstrated that [the defendant] knowingly and intelligently waived her right to remain silent and thus her statements are admissible."  Id.  The Eighth Circuit concluded the "district court correctly decided this issue."  Id.

Here, Petitioner's invocation of his right to silence is the only question presented in Ground One, not Petitioner's waiver of that right.  Therefore, it is not clear that the "totality of the circumstances" aspect of the Udey decision, which preceded the Supreme Court's December 10, 1984 decision in Smith, supra, (limiting the circumstances a court may consider to resolve the ambiguity of an individual's post-Miranda invocation of the right to silence), applies in this case.  To the extent Petitioner persists in his position that this Court must consider, based on Udey, the "totality of the circumstances" in deciding whether Petitioner invoked his right to remain silent, this Court concludes the subsequent United States Supreme Court decision in Smith limits the relevant circumstances to those occurring or existing either prior to or at the time of the invocation.

Petitioner also asserts

[c]ourts in and out of the Eighth Circuit have recently looked to broad context to hold that the phrase 'I don't want to talk anymore' is a clear and unambiguous invocation of Miranda rights.  See, e.g., United States v. Buchanan, [No. 8:14CR3, 2014 WL 1757588] (D. Neb. [Apr. 30,] 2014) [(finding "I don't want to talk about it" an unequivocal invocation of the right to silence)]; Jones v. Harrington, 829 F.3d 1128 (9th Cir. 2016) [(concluding "I don't want to talk no more" was a "request to remain silent [that] was unambiguous on its face and nothing about the prior context of the statement made it ambiguous or equivocal")]; United States v. Heine, , , , [No.] 3:15-cr-238-SI-1 (D. Or[.] [Nov. 17,] 2016) [(deciding that "I really don't want to say anymore" was an unambiguous invocation of the right to silence)]; and Smith v. Boughton, [No. 15-C-1235, 2017 WL 1743703] ([E].D. Wis. [May 4,] 2017) [(concluding the state supreme court "did not unreasonably apply federal law in finding that [the interrogated individual] did not unambiguously invoke his right to cut off questioning on all topics")].

Amendment right to remain silent, and "none of the language that precedes or follows" the statement "renders it unclear or ambiguous."

Petitioner urges this Court to read his invocation of his right to silence during the third interview "in light of his prior statements, including the statement that ended his second interrogation." Petitioner points out the Court of Appeals, without deciding whether the statement at the end of the second interview effectively invoked Petitioner's right to silence, concluded that Sergeant Rice appeared to respond to that statement as though it was an invocation of Petitioner's right to silence and "scrupulously honored" it by ending the second interview. See O'Neal, No. WD74687, at 12, 13 and 15, Resp'ts Ex. E. Petitioner asserts Sergeant Rice should have (1) considered Petitioner's statement "I still don't feel like talking" at the beginning of the third interview, which began approximately five hours after the start of the second interview, as "a clear re-invocation of the right to remain silent" and (2) "scrupulously honored" it.[31]

---

None of the decisions cited by Plaintiff constitute precedent for this Court or address language that allegedly invokes the right to silence similar to the language at issue in this case. Therefore, the Court need not further discuss these cases.

[31] Petitioner in particular contends:

Respondent[s] argue[] that only one of the five Bucklew factors for determining whether the right to remain silent has been "scrupulously honored" has gone unmet. Factor two, meanwhile, is met only if "significant time" has elapsed between interrogations. .. . . Respondent[s] cite[] cases where a few hours qualified as "significant time" between interrogations. These cases are not dispositive. Other case law holds that three hours is not "significant time[";] nor is five hours." [citations to a Ninth Circuit case and a Fifth Circuit case omitted]. It remains for this Court to determine whether the five hours between [Petitioner]'s [second and third] interrogations was "significant time." If it was not, then this Court has all the more reason to consider [Petitioner]'s invocation at the end of his second interrogation and the re-invocation at the start of his third interrogation together.

Pet'r reply at 4-5 [ECF No. 19]. While Respondents may have presented such an argument in the state court proceedings, in this federal habeas proceeding, Respondents do not argue or cite authority regarding whether the passage of time between Petitioner's second and third interviews was significant enough to support a finding Petitioner's invocation of his right to silence at the end of the second interview was "scrupulously honored" by initiation of the third interview. Resp's response at 5-18.

To the extent this Court should consider in this proceeding Petitioner's challenge to the amount of time between the second and third interviews as insignificant for purposes of scrupulously honoring Petitioner's right to silence invoked at the end of the second interview, the Missouri Court of Appeals found that Mosley characterized "'an interval of more than two hours' [between interrogations], 423 U.S. at 104, as 'the passage of a significant period

The Supreme Court has characterized <u>Miranda</u>'s reference to the right to cut off questioning as requiring that an interrogation must cease when the right to silence is invoked but as "not stat[ing] under what circumstances, if any, a resumption of questioning is permissible." <u>Mosley</u>, 423 U.S. at 101 (footnote omitted).  Rather, the Supreme Court held "neither this passage nor any other passage in the <u>Miranda</u> opinion can sensibly be read to create a per se proscription of indefinite duration upon any further questioning by an police officer on any subject, once the person in custody has indicated a desire to remain silent." <u>Id.</u> at 102-03 (footnote omitted).  The Court is not persuaded that the statement Petitioner made at the end of the second interview is a prior circumstance properly considered as context for the statement Petitioner made during the third interview in light of (1) <u>Mosley</u>'s allowance of further questioning of a person in custody after the person invokes the right to silence, and (2) the Court of Appeals' conclusion that the initiation of the third interview more than four hours after the second interview ended, along with other factors, did not dishonor Petitioner's earlier invocation of his right to silence.

Petitioner also argues that neither (1) the "Mm-hmm" Petitioner provided to Sergeant Rice in the third interview before Petitioner's "I still don't feel like talking" statement nor (2) the "but I feel terrible" comment "immediately following [Petitioner]'s" statement "render[] the re-invocation unclear."  Petitioner contends the "Mm-hmm" was a "simple acknowledgement that there exist 'some things' that need to be cleared up [but] not an acquiescence to further questioning, especially when that acknowledgement [was] soon followed by the re-invocation 'I still don't feel like talking.'"  Petitioner contends a reasonable interpretation of those utterances is a conclusion

---

of time.'" <u>O'Neal</u>, No. WD74687 at 13, Resp'ts Ex. E.  Therefore, where, as here, more than two hours passed between Petitioner's second and third interviews the Court of Appeals did not unreasonably apply clearly established federal law by concluding that the "passage of an appreciable amount of time between [Petitioner]'s second and third interrogations cuts against his claim that the mere institution of the third interview violated his rights."  <u>O'Neal</u>, No. WD74687 at 13.

that Petitioner "was saying that he understood Sergeant Rice's need for further clarification <u>but</u> <u>nonetheless</u> did not want to talk" (emphasis in original).  Although Petitioner characterizes his interpretation of the "Mm-hmm" followed by "I still don't feel like talking" as reasonable, that characterization in and of itself does not mean the Court of Appeals unreasonably interpreted the utterances to the contrary as showing ambiguity regarding his right to silence.  Petitioner has not shown how the Court of Appeals' interpretation of "Mm-hmm" followed by "I still don't feel like talking" is unreasonable.

With respect to the phrase "but I feel terrible," which immediately followed and was part of Petitioner's statement that "I still don't feel like talking," Petitioner argues reading the word "but" as a contradiction of the invocation of his right to silence and a willingness to talk is "not a plausible reading."  Asserting that the "Eighth Circuit has not addressed the disjunctive [sic] 'but' in the context of a <u>Miranda</u> invocation," Petitioner cites <u>United States v. Lopez-Diaz</u>, 630 F.2d 661, 664 (9th Cir. 1980), as support for his position that the word "but" does "not invalidate [a] clear <u>Miranda</u> invocation."  The <u>Lopez-</u>Diaz decision is inapposite.  The defendant's statement in the <u>Lopez-Diaz</u> case is not similar to Petitioner's challenged statement in this case, except that both statements include the word "but."  Unlike the statement in <u>Lopez-Diaz,</u> Petitioner's statement did not convey in any manner his perspective that he would not talk about one subject (for instance, the shooting) but would talk about a different subject (for instance, the assault on Mr. Forbes).

No Supreme Court (and no Eighth Circuit) decision characterizes as unambiguous the type of assertion of a right to silence made by Plaintiff here.  The language Petitioner used, however, may reasonably be construed to connote ambiguity, as the Court of Appeals found.  The Eighth Circuit, in a different context, has held that "[t]he word 'but' is defined . . . as 'except'; 'on the

contrary'; 'yet' or 'still,' as a word of limitation." E.H. Rollins & Sons v. Board of Comm'rs of Grand Cnty., 199 F. 71, 78 (8th Cir. 1912). Accord Board of Trustees of Park College v. Attorney Gen., 129 S.W. 27, 30 (Mo. 1910) ("The meaning of the word 'but' varies somewhat according to the context. . . . [I]t is used to mean 'except,' and also sometimes to mean 'on the contrary' or 'on the other hand.' . . . Whichever meaning [the court] give[s] to the conjunction 'but,' whether 'except' or 'on the contrary,' [the court] must go back to the first part of the sentence to learn what the words following the 'but' mean. The word 'but' in [this case] was not intended to begin a new sentence or introduce a new topic."). The Missouri Court of Appeals interpreted the "but" in Petitioner's statement not as introducing a new topic or beginning a new sentence but as constituting an equivocation with respect to the preceding allegedly unambiguous invocation of Petitioner's right to silence. The equivocation, the Court of Appeals concluded, suggested that Petitioner was experiencing an internal turmoil – that Petitioner did not want to talk but felt compelled to do so. The Court is not persuaded that this interpretation is unreasonable in light of the evidence available of record and the relevant clearly established federal law. Cf. United States v. Adams, 820 F.3d 317, 323 (8th Cir. 2016) (concluding an interrogated defendant's post-Miranda statement, "Nah, I don't want to talk, man. I mean, I," was ambiguous because "[t]he phrase 'I mean' signaled that [the defendant] intended to clarify the statement, 'I don't want to talk, man'").

Based on the language used in, and the prior and immediate context of, Petitioner's complete statement made near the beginning of Sergeant Rice's third interview, the Court of Appeals reasonably found ambiguous Petitioner's effort to invoke his right to silence during the third interview.[32] Ground One is denied.

---

[32] In light of the limitation set forth in Smith, supra, the Court need not consider the Court of Appeals' decision to the extent it discusses circumstances occurring or existing after Petitioner's purported invocation of his right to silence.

(3)      Ineffective assistance of trial counsel (Grounds Two through Four)

In the part of Ground Two that is not procedurally barred (Petitioner's contention that his trial counsel provided ineffective assistance by failing to present Mike O'Neal to contradict Mr. Carlson's testimony) and in Grounds Three and Four, Petitioner presents three ineffective-assistance-of-trial-counsel claims.   Petitioner contends his trial counsel provided ineffective assistance by failing to investigate and present at trial three witnesses (Mr. Huskey, Mike O'Neal, and Ms. Williams) to contradict the trial testimony of either Mr. Forbes or Mr. Carlson.   The Missouri Court of Appeals addressed these claims on their merits.

(a.) Standard of review

The Sixth Amendment's guarantee of counsel is applicable to the States through the Fourteenth Amendment because it is a fundamental right and essential to a fair trial.   Gideon v. Wainwright, 372 U.S. 335, 342-45 (1963).   To establish an ineffective-assistance-of-counsel claim, Strickland requires a showing by a petitioner that:  (1) "counsel's representation fell below an objective standard of reasonableness" ("performance prong") and (2) "the deficient performance prejudiced the defense" ("prejudice prong").   Strickland, 466 U.S. at 688, 687.   A court need not address both prongs of the Strickland test if it finds the habeas petitioner has not established one of the prongs.   Id. at 697 ("there is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the [petitioner] makes an insufficient showing on one"); accord Osborne, 411 F.3d at 918 (stating the petitioner "did not satisfy the performance [prong of the Strickland test so the court] need not consider the prejudice" prong); Odem, 382 F.3d at 851 (stating "[i]t is not necessary for [a court] to consider the prejudice [prong] of the Strickland analysis" after concluding the petitioner did not satisfy the performance prong).

As the Supreme Court has explained, under the AEDPA "[t]he pivotal question" for a federal habeas court reviewing an ineffective-assistance-of-counsel claim that was subject to state court review on the merits, "is whether the state court's application of the Strickland standard was unreasonable." Harrington, 562 U.S. at 101. "Establishing that a state court's application of Strickland was unreasonable under § 2254(d) is all the more difficult." Id. at 105. "The standards created by Strickland and [Section] 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." Id. (internal citations omitted). Specifically, after a state court reviews the merits of an ineffective-assistance-of-counsel claim, it is not sufficient for a federal habeas petitioner to "show that he would have satisfied Strickland's test if his claim were being analyzed in the first instance." Bell v. Cone, 535 U.S. 685, 698–99 (2002). Instead, a habeas court "assess[es] the state courts' assessment of counsel's performance." Barnes, 765 F.3d at 814. Put another way, a federal habeas court views the ineffective-assistance-of-trial-counsel claim through two filters:  first, the court defers to the judgment of trial counsel under Strickland, 466 U.S. at 689, and then the court "defer[s] to the state courts' application of federal law to the facts of the case." Marcrum v. Luebbers, 509 F.3d 489, 501 (8th Cir. 2007).

A federal habeas petitioner "must show that the [state court] applied Strickland to the facts of his case in an objectively unreasonable manner." Bell, 535 U.S. at 699. "A state-court decision is 'unreasonable' within the meaning of [Section] 2254(d) only when it is 'so lacking in justification that there [is] an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" Daniels v. Kelley, 881 F.3d 607, 611 (8th Cir. 2018) (quoting Harrington, 562 U.S. at 103) (second alteration in original).

(b.)  Merits

As noted earlier, Petitioner challenges the Missouri Court of Appeals' decision, in Petitioner's PCR appeal, affirming the denial of Petitioner's claims his trial attorney provided ineffective assistance of counsel by failing to present Mike O'Neal (Ground Two), Mr. Huskey (Ground Three) and Ms. Williams (Ground Four) as witnesses at trial to contradict the trial testimony of either Mr. Carlson (Grounds Two and Four) or Mr. Forbes (Ground Three). Additionally, although urging "each of the [ineffective-assistance-of-trial-counsel] grounds is sufficiently prejudicial to require reversal," Petitioner "alternatively requests that the court consider whether the cumulative effect of the grounds sustained is sufficiently prejudicial to require relief."  Pet'r pet'n at 18 n.3 [ECF No. 1].

The Missouri Court of Appeals concluded Petitioner failed to establish either prong of Strickland with respect to each of these claims.  First, the Court of Appeals concluded that, based on the second PCR motion court's findings and conclusions, none of the three proposed witnesses "would have produced a viable defense and, at best, would only have served as an attempt to impeach certain of the State's witnesses at trial."  O'Neal, No. WD78273, Resp'ts Ex. I, at 9 [ECF No. 10-9]. The Court of Appeals noted the second PCR motion court concluded that none of the three proposed trial witnesses were credible and, in particular, that Mike O'Neal and Ms. Williams were "biased, inconsistent, and not credible as attempts to cast doubt on [Mr.] Carlson's incriminating testimony (toward [Petitioner]) and the competency of [Petitioner]'s trial counsel." Id. at 8.  Additionally, the Court of Appeals found, with respect to Mr. Huskey, that, as the second PCR motion court had noted,

> [Mr.] Huskey's past criminal convictions for fraudulent use of a credit card device, for making a false report, for forgery, and for the possession and sale of drugs, were no coincidence, and the [second PCR] motion court attributed no credibility whatsoever to [Mr.] Huskey's testimony that attempted to cast doubt on [Mr.] Forbes'[] incriminating testimony and the competency of [Petitioner]'s trial counsel.

Id.

Next, the Court of Appeals considered the testimony of Mr. Forbes and Petitioner's trial counsel during the second PCR motion hearing.  In particular, the Court of Appeals stated:  "[Mr.] Forbes testified that his trial testimony was accurate, that he never made any statements to anyone that contradicted his trial testimony (as [Mr.] Huskey asserted in his testimony), and that, in fact, he had not had any contact whatsoever with [Mr.] Huskey after [Victim] was murdered."  Id. at 9. With respect to Mr. Forbes' hearing testimony, the Court of Appeals noted the second PCR motion court found "his testimony to be both consistent and credible."  Id.  With respect to Petitioner's trial counsel's testimony, the Court of Appeals acknowledged the second PCR motion court

> found trial counsel's testimony to be credible when she testified that her office had investigated the witnesses [Petitioner] claims were not investigated and as to her sound trial strategy for ruling out witnesses with obvious bias or criminal conviction histories – especially given the trial strategy to argue that [Petitioner] was not guilty of first-degree murder but rather second-degree murder (*i.e.*, because [Petitioner] had admitted shooting [Victim] when he was interviewed by the police).

Id.

The Court of Appeals agreed with the second PCR motion court that Petitioner's trial counsel was not ineffective in:  (1) not calling Mr. Huskey to impeach Mr. Forbes' testimony because Mr. Huskey's "testimony was not credible; the decision was reasonable trial strategy; [his] testimony was, at best, nothing more than an attempt to impeach the testimony of a prosecution witness; and [Petitioner] could not otherwise establish that he was prejudiced by counsel's actions considering the overwhelming evidence of [Petitioner]'s guilt"; or (2) failing to call Mike O'Neal and Ms. Williams to attempt to impeach Mr. Carlson because "their testimony was not credible; their testimony was inconsistent . . . ; their testimony was, at best, nothing more than an attempt to impeach the testimony of a prosecution witness; and the evidence of [Petitioner]'s guilt was

overwhelming." <u>Id.</u> at 9-10.   Finally, the Court of Appeals "agree[d] with the motion court's conclusion that [Petitioner]'s trial counsel's strategy was sound (focusing argument at trial that [Petitioner] may be guilty of second-degree murder but not first-degree murder), particularly given [Petitioner]'s admission to police that he had, in fact, shot [Victim]." <u>Id.</u> at 10.

Petitioner contends, in his petition and through testimony presented at the second PCR evidentiary hearing, that Mike O'Neal and Ms. Williams would have contradicted Mr. Carlson's testimony:  (1) that he and Petitioner got the gun from Mr. Carlson's home (by testifying Mr. Carlson told them that Petitioner and Mr. Carlson obtained the gun from the back of a truck); and (2) that, before the shooting, Petitioner stated he was going to kill Victim (by testifying that Mr. Carlson did not tell Mike O'Neal or Ms. Williams that Petitioner made that statement). Additionally, Petitioner challenges counsel's failure to introduce Mike O'Neal's and Ms. Williams' testimony that Mr. Carlson seemed surprised to learn Victim had died.  To contradict Mr. Forbes' trial testimony, Petitioner alleges Mr. Huskey would have testified that a couple of months after the shooting and again two weeks later when they were in a truck, Mr. Forbes told Mr. Huskey that Mr. Forbes and Petitioner had been wrestling over the gun, during the struggle the gun went off, and Mr. Forbes believed he pulled the trigger.

Respondents counter that the Court of Appeals properly identified <u>Strickland</u> as providing the governing federal law for these grounds for relief, its decision is reasonable and entitled to deference, and the decision is supported by the record.  Therefore, Respondents urge, the Court of Appeals' decision is not contrary to or an unreasonable application of clearly established law or an unreasonable determination of the facts.  Characterizing Petitioner's challenges as constituting disagreement with the state court's factual findings, Respondents argue such disagreement does not entitle Petitioner to habeas relief.

The Missouri Court of Appeals explicitly discussed Strickland in its decision in Petitioner's post-conviction appeal.  Therefore, its decision is not contrary to clearly established law applicable to the merits of Petitioner's ineffective-assistance-of-trial-counsel claims.  The Court, therefore, under the doubly deferential review this Court must provide with respect to these claims, focuses on the reasonableness of the Court of Appeals' application of that decision to the circumstances of this case and of the Court of Appeals' determination of the facts in reaching its decision.

(1)  Performance prong

Strickland's performance prong "sets a high bar" that is satisfied "only when the lawyer's errors were 'so serious that counsel was not functioning as the "counsel" guaranteed . . . by the Sixth Amendment.'"  Buck v. Davis, 137 S. Ct. 759, 775 (2017) (quoting Strickland, 466 U.S. at 687).  Importantly, "the Sixth Amendment does not guarantee the right to perfect counsel," Burt, 571 U.S. at 24, "perfect advocacy judged with the benefit of hindsight," Yarbrough v. Gentry, 540 U.S. 1, 6 (2003) (per curiam), or "the best representation," United States v. Davis, 406 F.3d 505, 510 (8th Cir. 2005).  Rather, "[t]he Sixth Amendment right to counsel 'is the right to the effective assistance of counsel.'  Strickland, 466 U.S. at 686."  Buck, 137 S. Ct. at 775.

To satisfy Strickland's performance prong, a petitioner must demonstrate that "counsel's performance was so deficient as to fall below an objective standard of the customary skill and diligence displayed by a reasonably competent attorney."  Armstrong v. Kemna, 534 F.3d 857, 863 (8th Cir. 2008) (citing Strickland, 466 U.S. at 687-94).  In analyzing an attorney's performance under Strickland a court must make every effort to eliminate the "distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."  Bell, 535 U.S. at 698 (internal quotation marks omitted) (quoting Strickland, 466 U.S. at 689).

Additionally, judicial scrutiny of counsel's performance is highly deferential, indulging a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.  Strickland, 466 U.S. at 689.  A court must "strongly presume" that counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment," and maintain squarely on the petitioner the "burden to show that counsel's performance was deficient."  Burt, 571 U.S. at 22–23 (quotation marks and citation omitted).

Furthermore, there is "a strong presumption that counsel's challenged actions or omissions were, under the circumstances, sound trial strategy."  Garrett v. Dormire, 237 F.3d 946, 949-50 (8th Cir. 2001) (citing Strickland, 466 U.S. at 689).  Counsel's strategic decisions include trial decisions other than the decision whether to plead guilty, waive a jury trial, testify on one's own behalf, and take an appeal.  United States v. Washington, 198 F.3d 721, 723-24 (8th Cir. 1999).  A petitioner rebuts the presumption of strategy by showing "that counsel's actions actually resulted from inattention or neglect, rather than reasoned judgment."  Marcrum, 509 F.3d at 502.  "There [also] is a strong presumption that counsel's strategic choices were reasonable."  Forsyth v. Ault, 537 F.3d 887, 891 (8th Cir. 2008).  A petitioner's burden is not satisfied by arguing an attorney's "failure to articulate a strategic justification made defense counsel's inaction necessarily unreasonable."  Forrest v. Steele, 764 F.3d 848, 859 (8th Cir. 2014).

"Decisions relating to witness selection are normally left to counsel's judgment, and this judgment will not be second-guessed by hindsight."  Williams v. Armontrout, 912 F.2d 924, 934 (8th Cir. 1990) (en banc) (internal quotation marks and citation omitted)); accord Forrest, 764 F.3d at 858.  "A reasoned decision not to call a witness is a virtually unchallengeable decision of trial strategy."  Rodelo-Aguilar v. United States, 596 F.3d 457, 464 (8th Cir. 2010) (internal citation and quotation marks omitted).  When counsel's decision not to present a witness is "based on

justifiable concerns about the helpfulness (and potential harmfulness) of [the witness]'s testimony[,] . . . counsel's decision [is] based on [a] risk calculation [that] does not fall outside the bounds of <u>Strickland</u>."  <u>Forrest</u>, 764 F.3d at 858-59.

(a)  Mr. Huskey

Mr. Forbes testified at the evidentiary hearing to the circumstances about the night of the shooting as he had testified at trial.  PCR mot. hr'g, Resp'ts Ex. J, at 80-84.  With respect to Mr. Huskey, Mr. Forbes stated he met Mr. Huskey approximately a year before the shooting and never met with or spoke to him after the shooting.  <u>Id.</u> at 83, 86.

Mr. Huskey testified in his deposition that he knew Petitioner and Mr. Forbes from "hanging out with" with them.  PCR Legal File, Resp'ts Ex. F, at 43 [ECF No. 10-6].  At the time of the evidentiary hearing and his deposition, he was serving a five-year term of imprisonment for possession of a controlled substance and forgery convictions.  <u>Id.</u>  at 42.  His deposition was taken approximately ten weeks prior to the 2014 evidentiary hearing.

During his deposition, Mr. Huskey testified he saw Mr. Forbes at Mr. Forbes' home approximately two months after the shooting and, while they were sitting on a deck, Mr. Forbes began to cry and said "he made an accident, a mistake."  <u>Id.</u> at 47, 44, 68.  When Mr. Huskey asked him what the mistake was, Mr. Forbes told him:

> well, [Petitioner] really didn't do it. We was wrestling over the gun.  When [Petitioner] came in the house, [Mr. Forbes] tried to wrestle the gun out of [Petitioner]'s hand, and during the struggle [over] the gun, wrestling with the gun, [Mr. Forbes] said that he think[s] he's the one [who] pulled the trigger.

<u>Id.</u> at 46.  Mr. Huskey further stated that they had another conversation about one and half weeks later, while driving in Mr. Forbes' truck.  <u>Id.</u> at 47, 68.  In particular, Mr. Huskey stated that

> Mr. Forbes said that he think[s] that [Petitioner] shouldn't be in prison, that he know[s] that it's wrong for him and he needs to get it off his chest.  And he just

64

wanted to talk to somebody about it so we talked a little bit more about the same situation, and he basically said the same thing to me.

Id. at 55, 48.  Mr. Huskey did not talk to the police about these conversations, although he recalled meeting with two men several years earlier, in either 2009 or 2010, and discussing both of the conversations he had with Mr. Forbes with the two men, but he could not recall who those men were.  Id. at 54, 56-57, 69-70.  Mr. Huskey testified that in addition to the convictions for which he was then incarcerated, he had a 2003 conviction for the fraudulent use of a credit card device, two 2007 forgery convictions, and several drug-related convictions.  Id. at 60-66.

The transcript of the evidentiary hearing establishes that Petitioner's trial counsel had the materials, including a "witness file" for Mr. Huskey and information gathered by Petitioner's prior attorneys, and reviewed those materials and information as part of her representation of Petitioner.  See, e.g., Second PCR mot. hr'g tr., Resp'ts Ex. J, at 53-56 and 63-64.  Petitioner's trial counsel remembered an investigator gathering witness statements, including statements of Mr. Forbes' allegedly inconsistent statements, which she considered introducing and decided not to introduce at trial.  Id. at 58-59 and 64.  Petitioner's trial counsel testified that the credibility of each witness is "very important" and expressed concern "about credibility of witnesses," including specifically witnesses convicted of offenses involving dishonesty.  Id. at 67.  She further testified that she and her co-counsel "talked about" witnesses' credibility.  Id.

The Court of Appeals' determination that Petitioner's trial counsel's decision not to call Mr. Huskey constituted a "reasonable trial strategy" is a finding of fact subject to the reasonableness analysis set forth in Section 2254(d)(2).  See Wood, 558 U.S. at 301, 305 (holding under § 2254(d)(2) that the state court's "key factual finding" that counsel made "a strategic decision rather than a negligent omission" when deciding not to pursue and present evidence of the petitioner's mental deficiencies "was not an unreasonable determination of facts" in light of

the evidence presented in the state court proceedings).  Here, the evidence presented in the state court proceedings, in particular the testimony of Petitioner's counsel, Mr. Forbes, and Mr. Huskey (by deposition) at the evidentiary hearing in Petitioner's second PCR motion proceeding, as well as Mr. Forbes' testimony during trial, supports the Court of Appeals' determination that the decision of Petitioner's trial counsel not to present Mr. Huskey resulted from "reasoned judgment" or  deliberate choice,  rather than from counsel's oversight, inattention or neglect.  Id. at 301-02; Marcum, 509 F.3d at 502.  Therefore, the Missouri Court of Appeals' characterization of this alleged failure by counsel as reasonable trial strategy is not an unreasonable determination of the facts in light of the evidence presented in the state court proceedings under § 2254(d)(2).

This Court considers under Section 2254(d)(1), however, whether the strategic decision itself was a reasonable exercise of the attorney's professional judgment under Strickland and whether the Missouri Court of Appeals' application of Strickland was reasonable.  Wood, 558 U.S. at 304.  The state court record establishes Petitioner's trial counsel made the decision not to present Mr. Huskey, after reviewing information available through investigation by Petitioner's prior counsel and an investigator's provision of statements arguably inconsistent with Mr. Forbes' statements about what happened the night of the shooting.  Under the circumstances, this pre-decision effort by counsel supports the reasonableness of the attorney's strategic decision.

Moreover, Petitioner's trial counsel acted strategically within the bounds of reasonable professional judgment by not calling Mr. Huskey because his prior convictions for forgery, among other convictions implying his dishonesty, raised questions about his credibility.  Indeed, the state courts concluded he was not credible based on his testimony during the evidentiary hearing, while the same state courts found credible the testimony of Mr. Forbes and Petitioner's counsel.  Nothing submitted  or  argued  by  Petitioner  sufficiently  challenges  the  state  court's  credibility

66

determinations, to which this Court must defer.  Importantly, this Court cannot substitute its judgment as to the credibility of the witnesses for the judgment of the state court.  See Kennedy v. Kemna, 666 F.3d 472, 484 (8th Cir. 2012) (a federal habeas court "must defer to the credibility determinations of the motion court.  Perry v. Kemna, 356 F.3d 880, 885 (8th Cir. 2004)").

Having reviewed the state court proceedings during trial and the PCR evidentiary hearing, the Court concludes the Missouri Court of Appeals' decision that Petitioner's trial counsel did not engage in deficient performance by failing to present Mr. Huskey as a witness at trial was not an unreasonable application of Strickland and was not based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding under the principles of Wood. See Winfield v. Roper, 460 F.3d 1026, 1033–34 (8th Cir. 2006) (the petitioner's counsel's "decision not to call [the petitioner]'s friend . . . was reasonable since [the friend] had a criminal history").

### (b)  Mike O'Neal and Ms. Williams

Mike O'Neal and Ms. Williams are Petitioner's family members, specifically his father and his father's sister.  Mike O'Neal testified that after the shooting, Petitioner and Mr. Carlson arrived at his home, woke him up, and told him that they took a gun from the back of a black truck and Petitioner said that he thought Victim was shot when Mr. "Forbes grabbed [Petitioner] and the gun went off." PCR mot. hr'g tr., Resp'ts Ex. J, at 31 [ECF No. 10-10].  He further testified that later that morning, while Mr. Carlson was sitting in the dining room of the O'Neals' home, Mr. Carlson said that he and Petitioner had taken the gun out of a truck and gone to Victim's home "for [Petitioner] to sell it to" Mr. Forbes (although Mike O'Neal also stated that Petitioner had told him Mr. Carlson had "stole[n the gun] from his dad").  Id. at 35.  Additionally, during the conversation with Mr. Carlson at the O'Neals' home, Mike O'Neal stated, Mr. Carlson (1) did not

tell him "that [Petitioner] told [Mr. Carlson] he was going to shoot and kill" Victim before the shooting; and (2) told him that, while he was in the truck at Victim's home, he heard an argument "before he heard a shot." Id. at 35-36. Additionally, Mike O'Neal stated that he had contact with the attorneys who first represented Petitioner, as well as in-person contact with Petitioner's trial counsel. Id. at 36-37.

Ms. Williams testified that her brother, Mike O'Neal, called her around 2:00 a.m. on February 10, 2007, and asked her to come to his home due to an accident at the neighbor's home. Id. at 21. She arrived at the O'Neals' home at approximately 4:00 a.m. that morning and stayed until approximately 1:30 p.m. that afternoon. Id. at 23. She testified that, after Mr. Carlson came out of a bedroom, he sat in a chair near her in the dining room and Mike O'Neal "started talking to him," telling him Victim "had passed away" and "ask[ing] where they got the gun." Id. at 24. She testified that Mr. Carlson said they had "found [the gun] in the back of a black truck" and appeared "shocked" at hearing Victim had died. Id. at 24-25, 27. Ms. Williams further stated she met with Petitioner's first trial or plea counsel but not with his second trial counsel. Id. at 26.

As noted earlier, the transcript of the evidentiary hearing establishes that Petitioner's trial counsel had the materials and information gathered by Petitioner's prior attorneys and reviewed those materials and information as part of her representation of Petitioner. See, e.g., Second PCR mot. hr'g tr., Resp'ts Ex. J, at 53-56 and 63-64 [ECF No. 10-10]. While Petitioner's trial counsel did not recall speaking to Ms. Williams prior to trial, Petitioner's trial counsel testified she spoke with Mr. Carlson, Mike O'Neal, and Ms. Page prior to Petitioner's trial. Id. at 54-56.

Additionally, as noted before, Petitioner's trial counsel acknowledged that the credibility of each witness is "very important" and she was concerned "about credibility of witnesses," which she discussed with her co-counsel. Id. at 67. She explained that she had "more concern putting

68

on a family member as a fact witness than . . . putting on an inmate as a fact witness." <u>Id.</u>  In

particular, she testified, close family-member witnesses are "naturally . . . very easily discredited

. . . [because] they're clearly not unbiased." <u>Id.</u> at 67-68.

The decision whether to call family members as witnesses is a "strategic decision."

<u>Fretwell v. Norris</u>, 133 F.3d 621, 627 (8th Cir. 1998) (internal quotation marks omitted) (quoting

<u>Guinan v. Armontrout</u>, 909 F.2d 1224, 1231 (8th Cir. 1990)).  With respect to an attorney's

decision not to call family-member witnesses that counsel interviewed, counsel's decision not to

call the witness "falls within the broad range of performance permitted by <u>Strickland</u>." <u>Becker v.</u>

<u>Luebbers</u>, 578 F.3d 907, 920 (8th Cir. 2009).  If the rationale regarding the testimony of one

witness who was interviewed by counsel but not called at trial applies to another witness, even one

not interviewed by counsel, then the rationale supports the decision not to call the witness. <u>See id.</u>

(concluding the attorney's rationale for not calling a family member witness applied to support the

attorney's failure to call a boyfriend, "even [though] trial counsel did not interview the boyfriend").

Under the circumstances, the Court concludes the Missouri Court of Appeals' decision

regarding counsel's failure to present Mike O'Neal and Ms. Williams at trial includes an implicit

finding that the decision constituted reasonable trial strategy.  Counsel had spoken to Mike O'Neal

and Mr. Carlson prior to trial and had access to any record or material Petitioner's prior counsel

may have gleaned from meeting with Ms. Williams.  Ms. Williams and Mike O'Neal's proposed

trial testimony addressed the same topics and the same basis for contradicting Mr. Carlson's trial

testimony.  Notably, both Mike O'Neal's and Ms. Williams' allegedly contradictory testimony

arose out of their joint conversation with Mr. Carlson after he awakened in the O'Neals' home the

day of and hours after the shooting. <u>See</u> Second PCR mot. hr'g tr., Resp'ts Ex. J, at 21-23 and 34-

35.  Petitioner's trial counsel articulated legitimate concern about the bias of Petitioner's close

family members, especially in view of Ms. Page's testimony that Petitioner's family members' "stick together" to "protect" Petitioner.  Id. at 13.

The Court of Appeals' implicit determination that Petitioner's trial counsel engaged in a strategic decision not to call Mike O'Neal and Ms. Williams is, as noted earlier, a finding of fact subject to analysis for reasonableness under Section 2254(d)(2).  See Wood, 558 U.S. at 301, 305 (holding under § 2254(d)(2) that the state court's "key factual finding" that counsel made "a strategic decision rather than a negligent omission" when deciding not to pursue and present evidence of the petitioner's mental deficiencies "was not an unreasonable determination of facts" in light of the evidence presented in the state court proceedings).  Here, the evidence presented in the state court proceedings, in particular the testimony of Petitioner's counsel, Mike O'Neal, Ms. Williams, and Ms. Page during the second PCR hearing, as well as Mr. Carlson's testimony during trial, supports the Court of Appeals' determination that the decision of Petitioner's trial counsel not to present Mike O'Neal and Ms. Williams resulted from "reasoned judgment" or deliberate choice, rather than from counsel's oversight, inattention or neglect.  Id. at 301-02; Marcrum, 509 F.3d at 502.  Therefore, the Missouri Court of Appeals' characterization of this alleged failure by counsel as reasonable trial strategy is not an unreasonable determination of the facts in light of the evidence presented in the state court proceedings under § 2254(d)(2).

This Court considers under Section 2254(d)(1), however, whether the strategic decision itself was a reasonable exercise of the attorney's professional judgment under Strickland and whether the Missouri Court of Appeals' application of Strickland was reasonable.  Wood, 558 U.S. at 304.  The state court record establishes Petitioner's trial counsel made the decision not to present Mike O'Neal and Ms. Williams in consultation with her co-counsel and after discussing credibility

concerns.  Under the circumstances, this pre-decision effort by counsel supports the reasonableness of the attorney's strategic decision.

Moreover, Petitioner's trial counsel acted strategically within the bounds of reasonable professional judgment by not calling Mike O'Neal and Ms. Williams because their close familial relationship with Petitioner raised concerns about their credibility.  Indeed, the state courts concluded Mike O'Neal and Ms. Williams were not credible based on their testimony during the second PCR evidentiary hearing, while the same state courts found credible the testimony of Petitioner's counsel during that proceeding.  Nothing submitted or argued by Petitioner sufficiently challenges the state court's credibility determinations, to which this Court must defer.  Importantly, this Court cannot substitute its judgment as to the credibility of the witnesses for the judgment of the state court.  See Kennedy, 666 F.3d at 484 (a federal habeas court "must defer to the credibility determinations of the motion court.  Perry . . . , 356 F.3d [at] 885 . . . ").

The Court concludes the state court's decision that Petitioner's trial counsel's failure to present Mike O'Neal and Ms. Williams as witnesses at trial did not constitute deficient performance was not an unreasonable application of Strickland and was not based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding under the principles of Wood.  See Thomas v. Bowersox, 208 F.3d 699, 701-02 (8th Cir. 2000) (agreeing with the Missouri Court of Appeals' determination that the trial attorney's decision not to call the petitioner's son as a witness "was well within the bounds of reasonable professional judgment" and concluding "it was valid trial strategy for counsel to conclude that the son's testimony would not have helped, and may well have hurt" the petitioner's case).

Having concluded the Missouri Court of Appeals reasonably concluded Petitioner did not establish his trial counsel's deficient performance in failing to present Mike O'Neal, Mr. Huskey,

and Ms. Williams during trial, the Court need not address <u>Strickland</u>'s prejudice prong with respect to any of those failures.  <u>Strickland</u>, 466 U.S. at 697; <u>accord</u> <u>Osborne</u>, 411 F.3d at 918; <u>Odem</u>, 382 F.3d at 851.

Petitioner asks the Court to "consider whether the cumulative effect of the [ineffective-assistance-of-trial-counsel] grounds sustained is sufficiently prejudicial to require relief."  Pet'r pet'n at 18 n. 3 [ECF No. 1].  In the Eighth Circuit, a cumulative error argument is without merit when a habeas court does not hold that any of a petitioner's "individual claims of error amount to constitutionally defective representation."  <u>Becker</u>, 578 F.3d at 914 n.5.  Importantly, "accumulated prejudice" cannot be "based on asserted but unproven errors."  <u>Id.</u>  Because the Court has not found any of Petitioner's ineffective-assistance-of-trial-counsel grounds for relief "amount to constitutionally defective representation," the Court denies Petitioner's request for consideration of the cumulative effect of "sustained" grounds.

## IV. Certificate of appealability

A certificate of appealability ("COA") is required before a court of appeals may consider an appeal of a final order in a habeas proceeding under 28 U.S.C. § 2254.  28 U.S.C. § 2253(c)(1); Fed. R. App. 22(b)(1).  The requirement of a COA is jurisdictional.  <u>Gonzalez v. Thaler</u>, 565 U.S. 134 (2012).

A COA may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." § 2253(c)(2).  Importantly,

> [t]he COA inquiry . . . is not coextensive with a merits analysis.  At the COA stage, the only question is whether the applicant has shown that "jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."

Buck, 137 S. Ct. at 773 (quoting Miller-El v. Cockerell, 537 U.S. 322, 327 (2003)); accord Slack v. McDaniel, 529 U.S. 473, 484 (2000) (with respect to claims the federal habeas court resolves on the merits, a COA may issue if a petitioner demonstrates "reasonable jurists would find the . . . court's assessment of the constitutional claims debatable or wrong").  The "threshold question should be decided without 'full consideration of the factual or legal bases adduced in support of the claims.'" Buck, 137 S. Ct. at 773 (quoting Miller-El, 537 U.S. at 336).

> When a federal habeas court resolves a ground for relief on procedural grounds,
>
> without reaching the [merits of the petitioner's] underlying constitutional claim, a COA should issue when the [petitioner] shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.

Slack, 529 U.S. at 484.  Importantly, a court may "resolve the issue whose answer is more apparent from the record and arguments." Id. at 485.

The Court concludes Petitioner cannot make a showing that the Court's assessment and resolution of Petitioner's grounds for relief are debatable or wrong as required by Buck, Miller-El, and Slack.  Therefore, the Court will not issue a COA with respect to any aspect of the denial of Petitioner's petition.

## V. Conclusion

The Court does not address the merits of Petitioner's ineffective-assistance-of-trial-counsel claim in Ground Two only to the extent Petitioner challenges his counsel's failure to present Mike O'Neal at trial to contradict Mr. Forbes' trial testimony, because Petitioner has not demonstrated cause and prejudice to excuse Petitioner's procedural default of that claim.  The Court does not consider Petitioner's ineffective-assistance-of-PCR-motion-counsel claim in Ground Five because that claim is not cognizable in a Section 2254 proceeding.  Having found Ground Five is not

cognizable, the Court denies Petitioner's request for an evidentiary hearing to resolve that ground. The Court denies on their merits the other claims in Grounds One through Four.  Because none of Petitioner's ineffective-assistance-of-trial-counsel claims are "sustained," the Court also denies Petitioner's alternative request "that the court consider whether the cumulative effect of the grounds sustained is sufficiently prejudicial to require relief."

Accordingly, after careful consideration,

**IT IS HEREBY ORDERED** that Eileen Ramey, the present Warden of the JCCC, is **SUBSTITUTED** for the originally named Respondent in this habeas proceeding.

**IT IS FURTHER ORDERED** that Missouri Attorney General Eric Schmitt is **ADDED** as a Respondent.

**IT IS FURTHER ORDERED** that, because Petitioner's Ground Five is not cognizable in this Section 2254 proceeding, Petitioner's request for an evidentiary hearing to resolve that claim [ECF No. 19 at 10] is **DENIED**.

**IT IS FURTHER ORDERED** that, because the Court does not sustain any of Petitioner's ineffective-assistance-of-trial-counsel claims, Petitioner's request that the Court consider "the cumulative effect of the grounds sustained" [ECF No. 1 at 18 n. 3] is **DENIED**.

**IT IS FURTHER ORDERED** that Petitioner's Petition for Writ of Habeas Corpus [ECF No. 1] is **DENIED**.

**IT IS FINALLY ORDERED** that the Court will not issue a Certificate of Appealability.

A separate judgment in accordance with this Memorandum and Order is entered this same date.

PATRICIA L. COHEN
UNITED STATES MAGISTRATE JUDGE

Dated this 16th day of December, 2020